*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 12a0037p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

AMANDA HEINRICH; REECE HEINRICH;
PHILLY TAVOLILLA; MICHAEL TAVOLILLA;
ANTHONY CASASSA; JILL CASASSA; DAVID
KRUGER; TONI FLENNIKEN; JON LUNDY;
REGINA LUNDY; CURTIS WRIGHT; ROBIN
WRIGHT; HAROLD SAENZ; ODALYS SAENZ,
                  *Plaintiffs-Appellants*,

    *v.*

WAITING ANGELS ADOPTION SERVICES, INC.,
a Michigan For-Profit Corporation; SIMONE
BORAGGINA, and JOSEPH BEAUVAIS,
                  *Defendants-Appellees*.

> No. 09-2470

_____

Appeal from the United States District Court
for the Western District of Michigan at Lansing.
No. 06-00168—Joseph G. Scoville, Magistrate Judge.

Decided and Filed: February 7, 2012

Before: GIBBONS and SUTTON, Circuit Judges; ADAMS, District Judge.[*]

_____

## COUNSEL

**ON BRIEF:** Joni M. Fixel, FIXEL LAW OFFICES, PLLC, Okemos, Michigan, for
Appellants. Kenneth Hardin, HARDIN THOMPSON, P.C., Southfield, Michigan, for
Appellees.

_____

[*]The Honorable John R. Adams, United States District Judge for the Northern District of Ohio,
sitting by designation.

—————————————

**OPINION**

—————————————

JULIA SMITH GIBBONS, Circuit Judge.   Plaintiffs-appellants Amanda and Reece Heinrich and six other couples (referred to collectively as "plaintiffs") appeal the district court's order granting the second motion for judgment on the pleadings filed by defendants-appellees, Waiting Angels Adoption Services, Inc. and its principals, Simone Boraggina and Joseph Beauvais (referred to collectively as "defendants").   The district court dismissed with prejudice, pursuant to Rules 12(b)(6) and 9(b), all claims in the plaintiffs' third amended complaint brought under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962.   On appeal, the plaintiffs argue (1) that the district court failed to include several alleged predicate acts in its analysis of their RICO claim, (2) that the district court erred in ruling that the third amended complaint did not adequately allege extortion, and (3) that the district court erred in concluding that the allegations in the third amended complaint failed to meet the requirement of continuity, which is necessary to establish a pattern of racketeering activity and a substantive RICO violation.   For the reasons that follow, we reverse.

I.

The plaintiffs are seven couples who enlisted the assistance of the Waiting Angels Adoption Services, Inc. ("Waiting Angels") in an attempt to adopt children from Guatemala.   Believing that they were defrauded in the course of their adoption efforts, the plaintiffs initiated suit in federal district court on October 24, 2006, naming Waiting Angels and its two principals, Simone Boraggina and Joseph Beauvais, as defendants.   The original complaint was first amended on March 26, 2007.   About a month later, the case was stayed due to the pendency of state criminal proceedings against the individual defendants.   After the state criminal proceedings were resolved, the district court granted the plaintiffs' motion to lift the stay on April 2008 and granted them permission to file a second amended complaint.

In response, the defendants filed a motion for judgment on the pleadings, pursuant to Federal Rules of Civil Procedure 12(c) and 9(b), which the district court granted. Some claims were dismissed with prejudice, but the plaintiffs were granted leave to amend and replead certain claims, including: (1) a RICO claim under section 1962(c) alleging Waiting Angels Adoption Services, Inc. as the enterprise and Boraggina and Beauvais as individual defendants, with the plaintiffs allowed to allege as predicate acts violations of federal mail fraud, wire fraud, and extortion statutes as well as violations of 18 U.S.C. §§ 2314 and 1952; (2) a RICO claim under section 1962(d) for conspiracy between Boraggina and Beauvais only, including the predicate acts identified above; and (3) various state law claims that are not at issue in this appeal.

The plaintiffs filed their third amended complaint on April 4, 2009. Counts 1 through 6 assert state law claims. Count 7 alleges violations of the mail and wire fraud statutes, 18 U.S.C. §§ 1341 and 1343, for the purpose of establishing the predicate acts of racketeering activity needed to support the RICO claims that follow. Count 8 asserts a claim that the individual defendants, Boraggina and Beauvais, committed a substantive RICO violation under 18 U.S.C. § 1962(c). It alleges that Waiting Angels constituted an "enterprise" within the meaning of the statute and that the individual defendants conducted the affairs of this enterprise through a pattern of racketeering activity, particularly through extortion and fraud. Finally, Count 9 asserts a RICO conspiracy claim between Boraggina and Beauvais under 18 U.S.C. § 1962(d).

The third amended complaint contains the following allegations that are particularly relevant to this appeal. First, as a general matter, the plaintiffs allege that the defendants advertised Waiting Angels's services on the internet and that the defendants' website displayed children that were advertised as available for adoption. The plaintiffs also allege that Waiting Angels was advertised as a non-profit organization, when, in reality, it was a for-profit organization.

*Plaintiffs Heinrich*

The Heinriches allege that on June 13, 2005, they were sent an email by the defendants containing baby pictures and that they decided to attempt to adopt baby Selvin, a baby pictured in the email and apparently available for adoption. They signed a contract with Waiting Angels and wired $12,000 for a "referral" or match. About a month earlier, they had been told by Boraggina that "[once] the dossier is certified, the adoption will be completed in 4-6 months." On January 30, 2006, Boraggina informed the Heinriches that the birth mother had not signed the necessary papers and the adoption could not proceed without this documentation.

*Plaintiffs Kruger and Flenniken ("Flenniken plaintiffs")*

The Flenniken plaintiffs allege that in January 2006, they received an invoice for foster care fees for $1050 for baby Maria, the child they hoped to adopt. In mid-March 2006, they traveled to Guatemala and discovered that baby Maria remained in an orphanage and had never lived in foster care. Beauvais then sent the Flenniken plaintiffs an email demanding that they pay the rest of the adoption fees, and they responded that, under the adoption contract, the fees were not due until the case was out of PGN (the Guatemalan family court), and they would not pay until that time. The couple alleges that in response the defendants sent a request to the Guatemalan attorney to stop the adoption until they were sent a certified check.

The Flenniken plaintiffs further allege that due to their frustration with Waiting Angels and the individual defendants, they hired a different adoption agency to complete their adoption.

*Plaintiffs Casassa*

The Casassas allege that they were matched with Guatemalan twins by the defendants around January 28, 2006, after which they signed an adoption agreement and wired money for adoption fees and foster fees. On May 24, 2006, Boraggina emailed to advise them that the twins had been reclaimed by their birth mother. They assert that

the twins had not been reclaimed by their birth mother but instead were already matched with another family through a different adoption agency. They allege that Boraggina had knowledge of this fact at the end of January 2006, when Waiting Angels collected fees for the adoption. They support this allegation by asserting further: (1) during the four months they were "matched" with the twins, the defendants sent no photos or medical information; (2) the U.S. Embassy in Guatemala had no record of a pending adoption case involving the Casassas; (3) the defendants did not respond to demands for proof that the plaintiffs' money had been sent to Guatemala; and (4) the twins had not been reclaimed by their birth mother but were matched with another adoptive family through a different adoption agency.

The Casassas also allege that on June 26, 2006, they contacted the defendants for an update and to inquire about the photos of new babies and toddlers being offered for adoption on the Waiting Angels website. The defendants informed the Casassas that the couple was not sent any referrals because the children pictured on the website were being handled by a Guatemalan attorney other than the attorney handling the twins' adoption. The couple further alleges that they were later told that the defendants could not get birth certificates for the babies they were displaying on the website.

*Plaintiffs Tavolilla*

The Tavolillas allege that they were considering baby Marvin for adoption and were sent his medical information by the defendants in May 2006. They were unsure of whether to begin the adoption process when they received a telephone call from Boraggina on May 25, 2006, advising them they needed to wire the money immediately to start the adoption process for baby Marvin because "He's gonna go, He's gonna go, He's gonna go!!" Shortly after wiring $16,000 to the defendants, the Tavolillas received a call from their pediatrician who determined that the child had serious health issues and advised them not to adopt the child. The Tavolillas allege that they were assured by Boraggina that if the child was not healthy, the adoption fee would be returned. When they made this refund request, however, Boraggina responded by saying that Beauvais

was responsible for such financial matters, that he was unavailable for a few days, and that she thought the money had already been sent to an attorney in Guatemala.

*Plaintiffs Lundy*

The Lundys allege that after two other unsuccessful adoption attempts in which the couple paid a total of $26,550 in fees, they emailed the defendants on July 13, 2006 to inquire about another baby featured on the Waiting Angels website. In a reply email, Boraggina informed the Lundys that the baby about whom they inquired was "unavailable to them because she was with a different attorney."

*Plaintiffs Wright*

The Wrights allege that in September 2005, they sent Waiting Angels $14,350 for the retainer fee and adoption payment for the adoption of baby Wendy, after which they were faxed an adoption agreement. The complaint does not contain any further details about the terms of this agreement for baby Wendy.

On January 2, 2006, the Wrights decided to adopt another child, baby Estafany, and sent the defendants another $14,350 to begin the adoption process. The contract for baby Estafany required them to pay $350 per month to the defendants to "offset private foster care fees for the child." The Wrights allege they learned through an investigator that the Guatemalan Adoption Agency and foster mother "never received the $350 per month that they were being charged by the Defendants."

*Plaintiffs Saenz*

The Saenz plaintiffs allege that on February 2, 2006, they wired $8,500 to the defendants for payment of "in country" fees, which they were told would be sent to the facilitators in Guatemala for the adoption of baby Maria. They were also charged $350 per month for foster fees. On May 14, 2007, the Saenz plaintffs discovered that the defendants had not paid the facilitator any money for the adoption and that the foster fees remained unpaid.

In response to this third amended complaint, the defendants filed a second motion for judgment on the pleadings pursuant to Rules 9(b) and 12(c) on May 15, 2009. After a hearing, the district court granted the defendants' motion, issuing an opinion in which it dismissed the federal claims with prejudice and the state law claims without prejudice. *Heinrich v. Waiting Angels Adoption Services, Inc.*, No. 5:06-cv-168, 2009 WL 3401171, at *20 (W.D. Mich. Oct. 19, 2009). Assessing the allegations that formed the basis for the RICO claims under 18 U.S.C. § 1962(c), the district court found that the complaint did not allege sufficient facts that could give rise to a plausible claim of extortion. The district court also concluded that there were only four plausible claims of mail or wire fraud, spanning the period between September 2005 to February 2006. The court went on to conclude that these four plausible claims were insufficient to show either a "closed-ended" or "open-ended" pattern of racketeering, and thus the plaintiffs were unable to establish a substantive violation of the RICO statute. Finally, the court found that the plaintiffs' RICO conspiracy claim could not stand because they were unable to plausibly allege an underlying RICO violation.

## II.

We review the district court's dismissal of a complaint pursuant to a Rule 12(c) motion *de novo*. *Rawe v. Liberty Mut. Fire Ins. Co.*, 462 F.3d 521, 526 (6th Cir. 2006). "The manner of review under Rule 12(c) is the same as a review under Rule 12(b)(6) . . . ." *Vickers v. Fairfield Med. Ctr.*, 453 F.3d 757, 761 (6th Cir. 2006).

In assessing a motion to dismiss under Rule 12(b)(6), this court construes the complaint in the light most favorable to the plaintiff, accepts the plaintiff's factual allegations as true, and determines whether the complaint "contain[s] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (internal quotation and citation omitted); *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 619 (6th Cir. 2002). A plaintiff's complaint must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

Courts are not required to accept as true legal conclusions couched as factual allegations. *Id*. (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). "Factual allegations must be enough to raise a right to relief above the speculative level . . . ." *Id*. "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss. . . . [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Iqbal*, 129 S. Ct. at 1950 (quoting Fed. R. Civ. P. 8(a)(2)) (internal citation omitted).

The plaintiffs must also meet the more rigorous pleading standards of Rule 9(b) with respect to their claims based on fraud. Rule 9(b) states that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). In order to allege fraud with particularity, the plaintiffs, at a minimum, must "'allege the time, place, and content of the alleged misrepresentation on which [they] relied; the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud.'" *United States ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 342 F.3d 634, 643 (6th Cir. 2003) (quoting *Coffey v. Foamex L.P.*, 2 F.3d 157, 161–62 (6th Cir. 1993)).

The plaintiffs challenge the dismissal of their RICO claim under 18 U.S.C. § 1962(c), which provides:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

18 U.S.C. § 1962(c). A violation of the statute requires "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985). A plaintiff must allege each element to properly state a claim. The plaintiffs challenge the district court's findings that only four predicate acts of racketeering activity were adequately alleged in the third amended complaint and that

these four predicate acts were insufficient to establish a pattern of racketeering activity. As discussed below, we agree with the district court that the plaintiffs have only adequately pled four predicate acts of racketeering activity, but we find that these four acts are sufficient to establish a pattern of racketeering activity.

## A. Predicate Acts of Racketeering Activity

Racketeering activity consists of acts which are indictable under a number of federal statutes listed in 18 U.S.C. § 1961(1)(B). In this case, the plaintiffs allege as predicate acts of racketeering activity: mail and wire fraud, 18 U.S.C. §§ 1341 and 1343; extortion in violation of the Hobbs Act, 18 U.S.C. § 1951; transmitting or transferring in interstate commerce goods, wares, merchandise, or money knowing the same to have been stolen, converted, or taken by fraud, 18 U.S.C. § 2314; and traveling in interstate or foreign commerce with the intent to distribute the proceeds of extortion, 18 U.S.C. § 1952.

On appeal, the plaintiffs argue that (1) the district court improperly ignored several predicate acts of mail and wire fraud committed by the defendants and (2) the district court incorrectly ruled that the third amended complaint did not adequately allege any predicate acts of extortion. These arguments are without merit.

## 1. Mail and Wire Fraud Allegations

Mail fraud consists of "(1) a scheme to defraud, and (2) use of the mails in furtherance of the scheme." *United States v. Jamieson*, 427 F.3d 394, 402 (6th Cir. 2005). The elements of wire fraud are essentially the same except that one must use the wires in furtherance of the scheme to defraud. *United States v. Daniel*, 329 F.3d 480, 486 n.1 (6th Cir. 2003) (noting that the statutes share the same relevant language and the same analysis should be used for each). "A scheme to defraud includes any plan or course of action by which someone uses false, deceptive, or fraudulent pretenses, representations, or promises to deprive someone else of money." *Jamieson*, 427 F.3d at 402. A plaintiff must also demonstrate *scienter* to establish a scheme to defraud,

which is satisfied by showing the defendant acted either with a specific intent to defraud or with recklessness with respect to potentially misleading information. *United States v. DeSantis*, 134 F.3d 760, 764 (6th Cir. 1998).

When pleading predicate acts of mail or wire fraud, in order to satisfy the heightened pleading requirements of Rule 9(b), a plaintiff must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Frank v. Dana Corp.*, 547 F.3d 564, 570 (6th Cir. 2008) (quoting *Gupta v. Terra Nitrogen Corp.*, 10 F. Supp. 2d 879, 883 (N.D. Ohio 1998)). A RICO plaintiff is not required to plead or prove first-party reliance on an allegedly false statement. *See Bridge v. Phoenix Bond & Indem. Co.* 553 U.S. 639, 648 (2008). To allege a valid RICO claim, however, a plaintiff must show not only that the predicate act was a "but for" cause of plaintiff's injuries, but also that it was a proximate cause. *Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 268 (1992). A plaintiff must show "some direct relation between the injury asserted and the injurious conduct alleged." *Id*.

First, plaintiffs argue that the district court erred in disregarding allegedly fraudulent emails sent by the defendants in May 2005. To support their claim, the plaintiffs point to documents gathered in the state criminal prosecution of Boraggina and Beauvais and included in the plaintiffs' response to the second motion to dismiss. These documents reveal an incident where, in a request for references, Boraggina sent prospective clients, Jeff and Cheryl Smith, (who are not parties to this lawsuit) an email containing the names of purported former clients "Tony and Carol Vitale" and their email address. This email address was actually owned and controlled by Beauvais. A few days later, the Smiths received an email from "the Vitales" that gave Waiting Angels a positive review. Plaintiff Amanda Heinrich also claims that when she was considering contracting with Waiting Angels, she relied upon "positive references" which she received from an email address later discovered to be owned by the defendants. The plaintiffs argue that these fraudulent communications violate the wire fraud statute and should be included as an additional predicate act.

These allegations, however, were not included in the plaintiffs' third amended complaint, and the plaintiffs never requested that the defendants' motion for judgment on the pleadings be converted into a motion for summary judgment. A district court generally may only consider matters outside the pleadings if they treat the motion "as one for summary judgment under Rule 56." Fed. R. Civ. P. 12(d). *See Jones v. City of Cincinnati*, 521 F.3d 555, 562 (6th Cir. 2008). Because the district court did not convert the defendants' motion into a motion for summary judgment, it properly ruled on the motion without considering these additional allegations of wire fraud. *See Patterson v. Novartis Pharm. Corp.*, No. 10-5886, 2011 WL 3701884, at *3 (6th Cir. August 23, 2011) (unpublished opinion).

Furthermore, even if the district court should have considered these additional allegations, the Heinrich plaintiffs have still failed to allege wire fraud with the required particularity since Amanda Heinrich's affidavit does not include the date she received the allegedly fraudulent email from the defendants. The Heinriches have also failed to show how the misrepresentation of the true author of these emails was a proximate cause of any injury to their business or property. Their alleged injuries are too attenuated from the alleged fraud. Their argument appears to be that the positive references served as an inducement to do business with Waiting Angels. But any injuries they may have suffered were not the direct result of the alleged fraudulent conduct. Rather, the false references helped put the Heinriches in a position to be defrauded by other, unrelated representations concerning the availability of specific children or how adoption fees will be spent. The false references, while perhaps a "but for" cause of the Heinriches' injuries, did not proximately result in any harm to their business or property. Thus, the plaintiffs have not adequately alleged any additional predicate acts of wire fraud resulting from emails containing fraudulent positive references about Waiting Angels.

The plaintiffs also argue that the district court improperly failed to include claims arising from alleged misrepresentations on the defendants' website as predicate acts of racketeering activity. The plaintiffs claim that the defendants "frequently advertised children on their website who they knew, or should have known, were unavailable for

adoption." They argue that the promise of ample children available for adoption induced them to pay non-refundable fees to facilitate adoptions that the defendants knew would be impossible to achieve. This argument is also without merit because the plaintiffs have not adequately alleged that the person making these representations acted with knowledge or reckless disregard of their falsity.

"Rule 9(b) requires not only specifying the false statements and by whom they were made but also identifying the basis for inferring scienter." *North Am. Catholic Educ. Programming Found., Inc. v. Cardinale*, 567 F.3d 8, 13 (1st Cir. 2009). "The courts have uniformly held inadequate a complaint's general averment of the defendant's 'knowledge' of material falsity, unless the complaint *also* sets forth specific facts that make it reasonable to believe that defendant knew that a statement was materially false or misleading." *Greenstone v. Cambex Corp.*, 975 F.2d 22, 25 (1st Cir.1992). While the plaintiffs have alleged in a general and conclusory fashion that the defendants knew that children they were advertising as available for adoption were not actually available, they have failed to set forth specific facts that would support a reasonable inference that (1) the children were actually unavailable and (2) the defendants knew they were not available.

For example, after an attempted adoption of a set of twins was unsuccessful, the Casassas alleged that they contacted the defendants and stated that the couple was "aware of many new baby and toddler photos being offered for adoption" on the Waiting Angels website. They alleged that defendants informed them that the couple was not sent any referrals because the children pictured on the website were being handled by a different Guatemalan attorney than the attorney handling the twins' adoptions. The couple further alleged that they were told later that the defendants could not get birth certificates for the babies they were displaying on the website.

The complaint does not specify who told the couple that the defendants could not get the birth certificates for the babies advertised on the website. More importantly, the complaint does not provide sufficient facts from which it would be reasonable to infer

that the children advertised were actually unavailable. Merely labeling the defendants' responses as "suspicious" does not suffice. Furthermore, the plaintiffs fail to allege any specific facts that would allow us to infer that at the time the defendants advertised children as available on their website, they made this promise of availability with knowledge of its falsity. These allegations raise only "the mere possibility of misconduct" and do not show the plaintiffs' entitlement to relief. *Iqbal*, 129 S. Ct. at 1950.

In summary, the plaintiffs have failed to adequately allege any additional predicate acts of mail or wire fraud.

## 2. Extortion Allegations

The plaintiffs also argue that the district court incorrectly held that they had failed to properly allege any instance of extortion in their third amended complaint. A plaintiff claiming a Hobbs Act violation of extortion as a predicate act in a civil RICO claim must establish that the defendant "obstruct[ed], delay[ed], or affect[ed] commerce or the movement of any article or commodity in commerce, by … extortion or attempt[ed] or conspir[ed] so to do, or committ[ed] or threaten[ed] physical violence to any person or property in furtherance of a plan or purpose to do [so]." 18 U.S.C. § 1951(a). Extortion is defined as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." 18 U.S.C. § 1951(b)(2).

The concept of extortion is not limited to fear of physical violence. Under the "fear of economic harm" theory, a private citizen can commit extortion by leading the victim to believe that the perpetrator can exercise his or her power to the victim's economic detriment. *See United States v. Kelly*, 461 F.3d 817, 826 (6th Cir. 2006). "[T]he fear of economic harm may arise independently of any action by the defendant, . . . [i]t is enough if the fear exists and the defendant intentionally exploits it." *United States v. Williams*, 952 F.2d 1504, 1513–14 (6th Cir. 1991). The perpetrator's threats or exploitation of a victim's fear must also be "wrongful" to constitute extortion. 18 U.S.C.

§ 1951(b)(2).  Thus, to properly claim acts of extortion in this case, the plaintiffs must allege facts and circumstances that show (1) that the defendants obtained the plaintiffs' property (2) through the wrongful use of (3) threats or fear of physical or economic harm.

The Flennikens allege they were victims of criminal extortion when the couple learned that defendants Boraggina and Beauvais had requested that the Guatemalan attorney stop work on the adoption of the baby the couple was pursuing until the remainder of the adoption fees was paid.  The plaintiffs labeled this conduct "emotional terrorism" but did not allege that they paid any money in response to this alleged threat. This claim does not amount to actionable extortion because the plaintiffs do not allege that the defendants "obtained property" as the result of this alleged threat.  By statutory definition, extortion requires the victim to be deprived of property and the perpetrator to "obtain" that property.  *Scheidler v. NOW, Inc.*, 537 U.S. 393, 405 (2003).  At most, the Flennikens have alleged that the defendants threatened them with emotional distress, which is insufficient to support a claim of extortion.

The Tavollias also allege they were subject to extortion.  Their claim centers around the allegation that while they were still considering adopting baby Marvin but before their physician had completed his review of his medical records, they were contacted by defendant Boraggina.  She advised them to begin the adoption process immediately, before their physician completed his review of the baby's health records, claiming "He's gonna go!"  In response, the couple wired $16,000 to the defendants and began the adoption process, only to discover shortly thereafter that the baby suffered from serious health problems.  These allegations show that Boraggina created a sense of urgency surrounding the start of the adoption process, but they do not establish that it was "wrongful."

First, the Tavollias do not allege any additional facts or circumstances that would provide grounds to conclude that this sense of urgency was not warranted—*i.e.*, that there was little chance that baby Marvin would soon become unavailable.  So plaintiffs

have not adequately alleged that this urgency was wrongful in the sense that it was false. Moreover, if we characterize the interaction between the plaintiffs and the defendants as a business transaction in which defendants are selling adoption services, the loss of the chance to adopt baby Marvin would place the Tavollias in fear of an economic harm, which, if improperly exploited, could amount to extortion. *See United States v. Collins*, 78 F.3d 1021, 1030–31 (6th Cir. 1996) (finding that the possibility of lost business opportunities is a type of economic fear within the scope of extortion). But this fear and any sense of urgency created by Boraggina was not wrongful in the sense that it was unreasonable or unfair under the circumstances. In the business context, Boraggina's behavior is best characterized as hard bargaining or a pressure sales tactic. *See Mathon v. Feldstein*, 303 F.Supp.2d 317, 325 (E.D.N.Y. 2004) (finding that "hard bargaining" does not constitute extortion).

On the other hand, if we consider the adoption process to be something other than a business transaction, the Tavollias have not shown that they were placed in fear of an economic harm. Now, the loss of the opportunity to adopt baby Marvin would not be considered a lost business opportunity. Instead, the sense of urgency would have placed the Tavollias in fear of purely emotional harm—fear that they would regret missing the chance to adopt baby Marvin. The plaintiffs do not cite any case in which the concept of extortion includes the exploitation of the fear of purely emotional harm, such as the distress one would likely experience if a hoped for adoption was lost. For these reasons, we conclude the Tavollias have not adequately alleged facts that might give rise to a plausible claim of extortion.

The plaintiffs also claim that the defendants frequently advertised children on the Waiting Angels website who they knew or should have known were unavailable for adoption and that this conduct amounted to extortion. They argue that the defendants "would play upon people's desire to adopt these children, wrongfully, to excise additional adoption fees from them." Setting aside the fact that this allegation was not pled in their complaint, it also is without merit. The use of a website to advertise children as available for adoption, who are actually unavailable, does not constitute a

threat nor induce fear of economic, or even emotional harm. On the contrary, as the plaintiffs acknowledge, the sight of many children supposedly available for adoption on the Waiting Angels website would inspire hope, not fear, that a couple would ultimately find a child they could successfully adopt. The alleged unavailability of children on the Waiting Angels website is a claim that the defendants committed fraud—a claim discussed and dismissed earlier—not that they committed extortion. In summary, the plaintiffs have failed to adequately allege any predicate acts of extortion in violation of the Hobbs Act in their third amended complaint.

### 3. Adequately Pled Allegations

The district court found that the complaint sufficiently alleged four predicate acts of mail or wire fraud: the Cassassas' claim of fraudulent representations made about the availability of a pair of twins (January 2006), and the Flennikens' (January 2006), Saenzs' (February 2006), and Wrights' (January 2006)[1] claims of fraudulent inducement of the payment of foster care expenses. *Heinrich*, 2009 WL 3401171 at *14, *16. We agree that these four claims do adequately allege predicate acts of mail or wire fraud as they have adequately alleged a scheme to defraud, the use of the mail or wires in furtherance of the scheme, and a sufficient factual basis from which to infer *scienter*. *See Jamieson*, 427 F.3d at 402; *DeSantis*, 134 F.3d at 764; *Cardinale*, 567 F.3d at 13.

The district court discussed and ultimately rejected many other claims of mail and wire fraud in its opinion, including claims by the Heinriches, Flennikens, Tavolillas, Lundys, Wrights, and Saenzs of "promissory fraud" involving representations concerning the defendants' timeliness and ability to complete adoptions and claims based on the alleged misrepresentation of Waiting Angels's nonprofit status. The rejection of these claims was proper, since the plaintiffs have not alleged sufficient information to render their claims of fraud plausible, as opposed to merely possible.

---

[1] The district court mistakenly stated that the date of the Wrights' claim for fraudulent inducement of the payment of foster care expenses was September 2005. The Wrights allege that they entered into two contracts and made payments to Waiting Angels for two different children, one in September 2005 and one in January 2006. The claim involving foster care fees arose out the contract for baby Estafany, entered into in January 2006.

*Iqbal*, 129 S.Ct. at 1950. As discussed above, the plaintiffs have not adequately alleged any additional predicate acts of mail or wire fraud or of extortion.

Accordingly, the plaintiffs have adequately alleged four predicate acts of racketeering activity, spanning a two-month period from January 2006 through February 2006. The question then arises whether these four acts, if proven, would be sufficient to establish a pattern of racketeering activity.

## B. Pattern of Racketeering Activity

To establish a substantive RICO violation, a plaintiff must show "a pattern of racketeering activity." 18 U.S.C. § 1962(c). A pattern of racketeering activity requires, at minimum, two acts of racketeering activity within ten years of each other. 18 U.S.C. § 1961(5). While the statute defines the minimum number of acts necessary to establish a pattern of racketeering activity, the Supreme Court has held that the minimum two acts are not necessarily sufficient. In order to show a "pattern" of racketeering activity, a plaintiff must show "that the racketeering predicates are related, *and* that they amount to or pose a threat of continued criminal activity." *H. J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 237–39 (1989). This requirement has come to be called the "relationship plus continuity" test. *See, e.g., Brown v. Cassens Transp. Co.*, 546 F.3d 347, 355 (6th Cir. 2008).

The relationship prong of this test is satisfied by showing the predicate acts have "similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *H. J. Inc.*, 492 U.S. at 240. It has been satisfied in this case. The predicate acts were committed by the same participants, Beauvais and Borragina, for similar purposes with similar victims using similar methods of commission. The individual defendants used email correspondence, telephone conversations, and a website connected to their Waiting Angels adoption agency to defraud hopeful adoptive parents out of adoption-related fees.

The continuity prong of the test can be satisfied by showing either a "close-ended" pattern (a series of related predicate acts extending over a substantial period of time) or an "open-ended" pattern (a set of predicate acts that poses a threat of continuing criminal conduct extending beyond the period in which the predicate acts were performed). *Id*. at 241–42. The plaintiffs cannot establish close-ended continuity. "A party alleging a RICO violation may demonstrate continuity over a closed period by proving a series of related predicates extending over a substantial period of time. Predicate acts extending over a few weeks or months . . . do not satisfy this [close-ended continuity] requirement. . . ." *Id.* at 242. (omitted text addresses the threat of future criminal conduct, which is part of an open-ended continuity analysis). This court has found that racketeering activity that spanned seventeen months did not constitute a substantial period of time. *See Vemco, Inc. v. Camardella*, 23 F.3d 129, 134 (6th Cir. 1994) (finding that allegations of four predicate acts, affecting one victim and spanning seventeen months, were insufficient to meet the continuity requirement). In this case, the predicate acts of racketeering activity spanned less than two months—January and February 2006—and thus do not meet the requirements for close-ended continuity.

The plaintiffs can, however, establish open-ended continuity. "Often a RICO action will be brought before continuity can be established [by showing predicate acts spanning a substantial period of time]. In such cases, liability depends on whether the *threat* of continuity is demonstrated." *H. J. Inc.*, 492 U.S. at 242. So the plaintiffs must plausibly allege that there was a threat of continuing criminal activity beyond the period during which the predicate acts were performed. Determining whether the predicate acts establish open-ended continuity requires a court to examine the specific facts of the case. *Id*. The threat of continuing racketeering activity need not be established, however, exclusively by reference to the predicate acts alone; rather, a court should consider the totality of the circumstances surrounding the commission of those acts. *Brown*, 546 F.3d at 355.

The defendants argue that because Waiting Angels was shut down as part of the criminal prosecution of the individual defendants, the enterprise currently poses no threat

of facilitating continued criminal activity, and the plaintiffs, therefore, cannot establish open-ended continuity. Subsequent events are irrelevant to the continuity determination, however, because "in the context of an open-ended period of racketeering activity, the threat of continuity must be viewed at the time the racketeering activity occurred." *United States v. Busacca*, 936 F.2d 232, 238 (6th Cir. 1991). "The lack of a threat of continuity of racketeering activity cannot be asserted merely by showing a fortuitous interruption of that activity such as by an arrest, indictment or guilty verdict." *Id.*; *see also Blue Cross & Blue Shield of Michigan v. Kamin*, 876 F.2d 543, 545 (6th Cir. 1989) (finding that continuity was established because, if the defendant had not been caught, there was no reason to believe he would not still be submitting fraudulent insurance claims); *Moon v. Harrison Piping Supply*, 465 F.3d 719, 729 (6th Cir. 2006) (Moore, J., concurring) (stating that the court should not consider events that transpired after the alleged racketeering acts ended when determining whether a threat of long-term racketeering activity has been properly alleged).

Moreover, the complaint does not allege an inherently terminable scheme—a pattern of racketeering activity with a built-in ending point—that has prevented this court from finding open-ended continuity in the past. *Vemco*, 23 F.3d at 134 (finding no open-ended continuity where only a single scheme to defraud one plaintiff the cost of one paint system was pled); *Vild v. Visconsi*, 956 F.2d 560, 569 (6th Cir. 1992) (finding the plaintiff had failed to plead open-ended continuity when "the acts alleged amount[ed] at best to a breach of contract with a single customer"); *Thompson v. Paasche*, 950 F.2d 306, 311 (6th Cir. 1991) (finding that there was no open-ended continuity because the defendant's fraudulent scheme to sell nineteen lots of land was "an inherently short-term affair" that would end once the lots were sold). Here, there is no inherent limit to the number of couples seeking to adopt or to the number of children that the defendants could hold out as available for adoption.

At the time that the defendants committed the four predicate acts alleged here, there was no indication that their pattern of behavior would not continue indefinitely into the future. The plaintiffs have thus adequately alleged a threat of continuing criminal

activity and, therefore, have sufficiently alleged a pattern of racketeering activity.[2] *See Busacca*, 936 F.2d at 237–38 (finding that six predicate acts committed in a span of two-and-a-half months was sufficient to establish open-ended continuity when the manner in which the racketeering activity occurred was capable of repetition indefinitely into the future).   Accordingly, because the plaintiffs have adequately alleged conduct of an enterprise committed through a pattern of racketeering activity, *Sedima*, 473 U.S. at 496, we find that the third amended complaint does state a claim upon which relief can be granted under 18 U.S.C. § 1962(c).   Dismissal of this claim pursuant to Rule 12(b)(6) was improper.

## III.

The plaintiffs also challenge the dismissal of their RICO conspiracy claim under 18 U.S.C. § 1962(d).  To plausibly state a claim for a violation of 18 U.S.C. § 1962(d), plaintiffs must successfully allege all the elements of a RICO violation, as well as alleging "the existence of an illicit agreement to violate the substantive RICO provision." *United States v. Sinito*, 723 F.2d 1250, 1260 (6th Cir. 1983).  "An agreement can be shown if the defendant objectively manifested an agreement to participate directly or indirectly in the affairs of an enterprise through the commission of two or more predicate crimes." *Id.* at 1261 (internal quotation and editing marks omitted).  The plaintiffs' third amended complaint does allege that Boraggina and Beauvais conspired to conduct the affairs of Waiting Angels through a pattern of racketeering activity, and this agreement can be inferred from the individual defendants' involvement in the four well-pled predicate acts in which they made false representations to hopeful adoptive couples with the goal of defrauding those couples of money.  Because the plaintiffs have adequately alleged both an underlying RICO violation and an agreement to participate in this violation, we find that the third amended complaint does state a claim upon which

---

[2]The plaintiffs also allege that the predicate acts represented the defendants' "regular way of conducting [their] on-going business activities," which is another way to establish open-ended continuity. *H.J. Inc.*, 492 U.S. at 243. Because we have found that the four predicate acts sufficiently demonstrate an ongoing threat  of racketeering activity, we need not decide the issue of whether the plaintiffs have included sufficient factual matter in their third amended complaint to find that this allegation is well-pled and not merely conclusory.

relief can be granted under 18 U.S.C. § 1962(d).  Dismissal of this claim pursuant to Rule 12(b)(6) was also improper.

## IV.

For the reasons provided above, we reverse the district court's judgment that dismissed the plaintiffs' RICO claims brought under 18 U.S.C. § 1962(c) and (d), and remand the case for further proceedings consistent with this opinion.