NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 18a0552n.06

No. 18-3144

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
Nov 02, 2018
DEBORAH S. HUNT, Clerk

| | |
|---|---|
| BERRYLANE TRADING, INC. | ) |
| | ) |
| Plaintiff-Appellant, | ) |
| | ) |
| v. | ) |
| | ) |
| TRANSPORTATION INSURANCE COMPANY | ) |
| | ) |
| Defendant-Appellee. | ) |
| | ) |

ON APPEAL FROM THE
UNITED STATES DISTRICT
COURT FOR THE
NORTHERN DISTRICT OF
OHIO

BEFORE: GIBBONS, SUTTON and McKEAGUE, Circuit Judges.

**JULIA SMITH GIBBONS, Circuit Judge.** After a thief broke into Berrylane Trading Inc.'s ("Berrylane") warehouse and stole $1,654,860 worth of iPhones, Berrylane submitted an insurance claim to Transportation Insurance Company ("TIC"). TIC denied the claim, contending that its insurance policy (the "Policy") did not cover loss at the warehouse. Berrylane sued, alleging breach of contract and bad faith. The district court dismissed Berrylane's complaint under Fed. R. Civ. P. 12(b)(6). It found that the Policy did not provide coverage for the theft because the warehouse was not a covered location under the Policy's Schedule of Locations. It also found that the theft was not covered under the Policy's Newly Acquired or Constructed Property endorsement (the "Endorsement") because the warehouse was not acquired during the requisite time period. We agree that the Policy does not cover loss at the warehouse and affirm the district court's dismissal of Berrylane's complaint under Fed. R. Civ. P. 12(b)(6).

I.

Berrylane buys and sells cell phones, including iPhones, to companies and individuals across the United States. Berrylane's principal place of business is in Bedford, Ohio,[1] and it insures its property through TIC, an Illinois-based insurance company. The insurance contract at issue began on April 7, 2015 and ran for the subsequent year. The Policy covered "business personal property" at the only location described in the contract's "Schedule of Locations and Coverage": Berrylane's Bedford, Ohio location at 24300 Solon Road. In addition, the Policy included a "Newly Acquired or Constructed Property" endorsement. The Endorsement included the following provision:

> **2. Business Personal Property**
>
> > a. **When a Limit of Insurance is shown in the declarations for Business Personal Property at any described premises, we will pay for direct physical loss of or damage to the following property caused by or resulting from a Covered Cause of Loss:**
> >
> > > (1) Business Personal Property, including such *property that you newly acquire*, at a *building you acquire by purchase or lease at any premises*, including those premises shown in the Declarations; and
> > > (2) Business Personal Property that you newly acquire at a described premises.
>
> . . .
>
> **3. Period of Coverage**
>
> > a. **With respect to Insurance under this Additional Coverage, coverage will end when any of the following first occurs:**
> > > . . .
> > >
> > > (2) 180 days expire after you acquire the property or begin to construct the property[.]

---

[1] Berrylane asserts that its principal place of business is in Solon, Ohio. This discrepancy does not alter whether this court has jurisdiction, and it appears to be a typo.

DE 1-1, Compl., Newly Acquired Property Endorsement Form, Page ID 67 (emphasis added.).

The Policy was implicated when, on December 7, 2015, a thief broke into Berrylane's warehouse in Doral, Florida and stole approximately $1,654,860 worth of iPhones. Immediately following the break-in, Berrylane submitted a claim for coverage to TIC. The Policy could have covered the loss in two ways: (1) if the theft occurred at a location specifically listed in the Schedule of Locations or (2) if the newly acquired iPhones were stolen at a location to which the Endorsement applied. TIC found that neither provision applied and therefore rejected Berrylane's claim for coverage. First, in a letter dated October 27, 2016, CNA Financial Corporation ("CNA") General Adjuster David Reitzel wrote Berrylane that the warehouse was not listed as a covered location under the Policy. He wrote: "The policy provides coverage for personal property at 24300 Solon Road, Bedford, Ohio. There is no coverage for personal property at 2602 NW 72nd Ave., Doral." DE 1-1, Compl. Ex. C, Letter, Page ID 247. Second, in a letter dated March 1, 2017, CNA closed the second possible avenue of coverage, informing Berrylane that its loss was also not covered under the Endorsement. The denial stated that:

> [T]he Doral, Florida, location was not newly acquired or constructed, according to the terms of the endorsement, because it was acquired *before* the Policy ever was incepted and not acquired during the course of the Policy. . . . There is no coverage at the Doral, Florida property location because it was not included on the policy as a described premises and that property was not newly acquired or constructed during the policy term.

DE 1-1, Compl., Ex. F, Letter, Page ID 258.

Berrylane disagreed that the Endorsement did not cover loss at the warehouse and, in October 2017, it filed a complaint alleging breach of contract and bad faith and requesting declaratory judgment on the parties' rights and obligations under the Policy, in the Cuyahoga County Court of Common Pleas in Ohio. Berrylane named three defendants: (1) CNA Financial Corporation ("CNA"); (2) Transportation Insurance Company ("TIC"); and (3) Busha-Okeson

Insurance. In November 2017, TIC, with the other defendants' consent, removed the case on federal diversity jurisdiction grounds to the United States District Court for the Northern District of Ohio. A week later, each defendant filed a motion to dismiss Berrylane's complaint for failure to state a claim under Fed. R. Civ. P. 12(b)(6).

In December 2017, Berrylane voluntarily dismissed its claims against CNA. And in January 2018, the district court dismissed Berrylane's remaining claims against TIC and Busha-Okeson Insurance. The district court held that the Policy did not provide coverage for the theft because the Endorsement did not cover losses at the warehouse. It found that "Berrylane did not 'acquire' the [w]arehouse during the Policy period and [the Newly Acquired Property endorsement] does not provide coverage." DE 22, Order, Page ID 472.

Berrylane timely appealed the district court's dismissal with respect to TIC.

II.

This court reviews *de novo* a district court's grant of a motion to dismiss under Fed. R. Civ. P. 12(b)(6). *Heinrich v. Waiting Angels Adoption Services, Inc.*, 668 F.3d 393, 403 (6th Cir. 2012). In reviewing a motion to dismiss under Fed. R. Civ. P. 12(b)(6), "this court construes the complaint in the light most favorable to the plaintiff, accepts the plaintiff's factual allegations as true, and determines whether the complaint 'contain[s] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *Heinrich*, 668 F.3d at 403 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft*, 556 U.S. at 678 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). The plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully" but is "not akin to a probability requirement." *Id.* (internal citations omitted).

Determining whether a complaint states a plausible claim for relief is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679. In conducting this analysis, a court "primarily considers the allegations in the complaint, although matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint, also may be taken into account." *Amini v. Oberlin College*, 259 F.3d 493, 502 (6th Cir. 2001) (quoting *Nieman v. NLO, Inc.*, 108 F.3d 1546, 1554 (6th Cir. 1997)).

## III.

On appeal, Berrylane posits three arguments. First, Berrylane contends that the Endorsement did not require it to acquire the *warehouse* during the Policy period; rather, Berrylane only had to acquire the *iPhones* during the policy period. Second, Berrylane asserts in the alternative that even if the warehouse had to be acquired during the period, this requirement was met because the warehouse was physically acquired after the Policy began even though the lease became effective prior to the Policy period. Berrylane argues that while the lease became effective in February 2015, before the Policy period, it did not begin using the warehouse until the summer of 2015, during the Policy period. Third, Berrylane contends that the district court incorrectly concluded that Berrylane's failure to report the acquisition of the warehouse, so TIC could adjust its premium, precluded the warehouse from coverage under the Policy. As to Berrylane's first two arguments, we conclude that the Endorsement required the warehouse to be acquired during the Policy period and that acquisition occurred when the lease became effective. We therefore conclude that the Policy did not cover loss at the warehouse. We decline to reach the third issue because it is unnecessary to decide the case.

A.

Berrylane's complaint raises state law claims under Ohio law, and the defendants removed to federal court on the basis of diversity of citizenship. Thus, this court applies the substantive law of Ohio and federal procedural law. *Biegas v. Quickway Carriers, Inc.*, 573 F.3d 365, 374 (6th Cir. 2009) ("Under the *Erie* doctrine, federal courts sitting in diversity apply the substantive law of the forum state and federal procedural law.") (citing *Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938)). In applying Ohio law, this court "must follow the decisions of the state's highest court when that court has addressed the relevant issue." *Savedoff v. Access Group, Inc.*, 524 F.3d 754, 762 (6th Cir. 2008) (quoting *Talley v. State Farm Fire & Cas. Co.*, 223 F.3d 323, 326 (6th Cir. 2000)). Thus, this court must determine whether Berrylane stated a claim for relief that was plausible under Ohio contract law. *See id.* at 762–63 (applying Ohio law in federal diversity jurisdiction case to determine whether contract was breached).

"An insurance policy is a contract." *Westfield Ins. Co. v. Galatis*, 797 N.E.2d 1256, 1261 (Ohio 2003). To establish a breach of contract in Ohio, a plaintiff must prove, by a preponderance of the evidence, "the existence of a contract, performance by the plaintiff, breach by the defendant, and damage or loss to the plaintiff." *Jarupan v. Hanna*, 878 N.E.2d 66, 73 (Ohio Ct. App. 2007) (quoting *Powell v. Grant Med. Ctr.*, 771 N.E.2d 874, 881 (Ohio Ct. App. 2002)). Here, the issue is whether TIC breached a contractual term in denying Berrylane coverage for the loss of the cellphones. It is thus necessary to determine whether the insurance contract covered loss at Berrylane's Florida warehouse.

Under Ohio law, "[w]hen confronted with an issue of contractual interpretation, the role of the court is to give effect to the intent of the parties to the agreement." *Westfield Ins. Co.*, 797 N.E.2d at 1261. The court "examine[s] the insurance contract as a whole and presume[s] that the

intent of the parties is reflected in the language used in the policy." *Id.* Generally, the court "look[s] to the plain and ordinary meaning of the language used in the policy[,] unless another meaning is clearly apparent from the contents of the policy." *Id.*; *see Alexander v. Buckeye Pipe Line Co.*, 374 N.E.2d 146, 150 (Ohio 1978) ("[C]ommon words appearing in a written instrument are to be given their plain and ordinary meaning unless manifest absurdity results or unless some other meaning is clearly intended from the face or overall contents of the instrument."). When the language in a written contract is clear, the court may only look at the writing itself to determine the intent of the parties. *See Westfield Ins. Co.*, 797 N.E.2d at 1261. In Ohio, as a matter of law, a contract is unambiguous "if it can be given a definite legal meaning." *Id.* To the contrary, where language in the contract cannot be given a definite legal meaning, courts may consider extrinsic evidence to ascertain the parties' intent. *Id.* A court may not, however, "imput[e] an intent contrary to that expressed by the parties." *Id.* at 1261–62.

In the insurance context, "ambiguity in an insurance contract is ordinarily interpreted against the insurer and in favor of the insured." *Id.* at 1262 (citing *King v. Nationwide Ins. Co.*, 519 N.E.2d 1380, 1383 (Ohio 1988) ("[I]t is well-settled that, where provisions of a contract of insurance are reasonably susceptible of more than one interpretation, they will be construed strictly against the insurer and liberally in favor of the insured.")). But where an insured provides an unreasonable interpretation of the policy, the court will not construe ambiguity in favor of the insured. *Id.* ("Although, as a rule, a policy of insurance that is reasonably open to different interpretations will be construed most favorably for the insured, that rule will not be applied so as to provide an unreasonable interpretation of the words of the policy." (quotation omitted)); *see also Westfall v. Dlesk*, 46 N.Ed.3d 124, 128 (Ohio Ct. App. 2015) ("When an ambiguity exists in

an insurance policy, the policy should be construed liberally in favor of coverage, unless such an interpretation would be unreasonable.").

B.

First, Berrylane contends that the district court erred in determining that the Endorsement required the warehouse to be acquired during the Policy period. The district court found that "[i]f this phrase was meant to include properties that were acquired prior to the effective date of the Policy, it would use the past tense 'acquired.' It does not." DE 22, Order, Page ID 473. We agree with the district court that the Endorsement only covered locations acquired during the Policy period.

Corporations, like Berrylane, both expand to new locations and add new personal property as they grow. With either type of growth, their insurance companies' exposure to risk also grows, and parties usually amend their insurance coverage accordingly. Before an insured acquires more permanent insurance coverage, though, its contract may provide a "Newly Acquired or Constructed Property" endorsement. This endorsement is typically intended to provide temporary insurance coverage for newly acquired or constructed property while the insured obtains permanent coverage. *See* THE BALANCE SMALL BUSINESS, https://www.thebalancesmb.com/newly-acquired-property-462689/ (last visited Sept. 11, 2018).

Here, determining whether the provision "at a building you acquire by purchase or lease at any premises" limited coverage to buildings Berrylane acquired after the Policy period began turns on the meaning of the word "acquire." We look to the plain and ordinary meaning of the word to begin our analysis. Merriam-Webster dictionary defines "acquire" to mean "to get as one's own" or "to come into possession or control of often by unspecified means." *Acquire*, MERRIAM-WEBSTER.COM, http://merriam-webster.com/dictionary/acquire (last visited Sept. 19, 2018). The

8

tense of "acquire" affects the meaning of the sentence. For example, a policy might say "at a building you *have acquired or acquire* by purchase or lease." This wording would seemingly extend to buildings that had been acquired prior to the Policy period as well as ones acquired within the Policy period. But the wording of the Policy at issue only includes the present tense, which strongly suggests that it only covers buildings acquired after the inception of the Policy period.

The Ohio Court of Appeals has provided helpful support. In *Spike Industries, Inc. v. Midwestern Indemn. Co.*, the Ohio Court of Appeals interpreted a similar insurance policy provision—a newly acquired or constructed property provision which extended coverage to business personal property "at *any location you acquire* other than at fairs or exhibitions." No. 06 MA 148, 2007 WL 4145842, at *2 (Ohio Ct. App. Nov. 14, 2007) (emphasis added). The court held that the policy "cover[ed] personal property at newly acquired locations, not newly acquired personal property at any location." *Id.* at *3. The court reasoned that this interpretation avoided "an arbitrary distinction between personal property acquired at fairs and exhibitions and that acquired from other sources" in the context of an insurance contract "designed to primarily insure the real estate owned by Spike Industries and the personal property within that real estate, not all of Spike Industries' personal property, wherever it may be found." *Id.* Similarly, Berrylane's insurance contract was primarily designed to cover one specific location – the Solon Road location listed on the Schedule of Locations. Thus, as in *Spike*, the heart of the Policy was about covering property at the Solon Road location—it was not a policy intended to cover all Berrylane's business personal property "wherever it may be found." To read the Endorsement as covering all business personal property "wherever it may be found" would cut against the purpose of listing specific locations for coverage in the contract.

Other state courts have similarly concluded that analogous provisions refer to property acquired after the inception of the policy period. For example, the Texas Court of Appeals found that the newly acquired property provision "had to be at a location that [the insured] 'acquires' during the policy period." *3109 Props, L.L.C. v. Truck Insurance Exchange*, No. 03-13-00350-CN, 2015 WL 3827580, at *5 (Tex. App. June 18, 2015). The court found that interpreting the provision to include locations the insured already owned "ignores the active nature of the dynamic verb 'acquire,'" and that the verb acquire "represents an action—that of obtaining" and that the section thus "extends coverage to business personal property at locations [the insured] acquires—i.e. gets or obtains—during the policy period." *Id.*; *see also On-Site Fasteners and Construction Supplies, Inc. v. Mapfre Ins. Co. of Fla.*, 82 So.3d 1001, 1003 (Fla. Dist. Ct. App. 2011) (concluding that the provision "at *any location you acquire* other than at fairs, trade shows or exhibitions" was "somewhat poorly drafted" but nevertheless was restricted to "coverage for business personal property located at a 'newly acquired location,' so long as it [was] not at a fair, trade show, or exhibition") (emphasis added). In these cases, the courts interpreted "you acquire" as indicating acquisition after the inception of the Policy period. Given the active nature of the verb "acquire," the Endorsement, which applied to newly acquired business personal property at "a building *you acquire*" (emphasis added), only covered locations that Berrylane acquired after the inception of the Policy.

## C.

Given that the Endorsement covered property at locations acquired during the Policy period, we must next consider what it means to "acquire" a building. Berrylane contends that acquisition means "physical possession or control," while the district court found that Berrylane acquired the warehouse when the lease became effective but before Berrylane began using the

building. It is unsurprising that Berrylane wants acquisition to relate to the time it began physically using—rather than leasing—the warehouse. If we were to adopt Berrylane's proffered meaning, its acquisition of the warehouse would fall within the Policy period, and Berrylane's loss would be covered by the Endorsement. We disagree with Berrylane's position, as did the district court.

Again, we start with the plain and ordinary meaning of the word "acquire." As stated above, Merriam-Webster dictionary defines "acquire" to mean "to get as one's own" or "to come into possession or control of often by unspecified means." *Supra* p. 9. As possession could be legal or physical, this dictionary definition does little to guide us in our explication. Instead, we look to common contexts in which we encounter the word "acquire."

Berrylane points us to automobile insurance. It argues that acquire means physical possession because that's how car insurance works. Berrylane analogizes to *Artisan & Truckers Cas. Co. v. JMK Transp., LLC*, where the court found that "ownership for insurance purposes in an automobile accident hinges on physical possession of the automobile." 994 N.E.2d 528, 533 (Ohio Ct. App. 2013). This possession requirement makes sense for automobile insurance: insurance is relevant when the person who physically drives the car gets into an accident; the person whose name is on the title and registration for the car may be unrelated to the accident. But real property is different. Real property insurance is not meant just to cover situations in which the insurance holder is physically at the insured property; instead, insurance protects loss at the property even when the insurance holder is not present.

The doctrine of adverse possession provides a useful example of how legal, rather than physical, possession relates to real property. Under the doctrine of adverse possession, a plaintiff can "acquire" legal title to another's real property if he proves physical possession, among other factors, for the relevant statutory period of limitations. *Houck v. Bd. Of Park Commrs. of the*

11

*Huron Cty. Park Dist.*, 876 N.E.2d 1210, 1212 (Ohio 2007). Thus, although physical possession of property is one factor that courts consider when determining whether a party has acquired real property, it is *legal* possession that allows the adverse possessor to remain on the property without worry of ejectment. Hence, it is *legal*, not physical, possession that ultimately matters. Applied in the insurance context, this is contrary to Berrylane's argument that it is physical, rather than legal, possession that determines whether the insurance holder has acquired property.

Similarly, common sense directs us to interpret "acquire" as legal, rather than physical, possession of real property. When one buys a house, it is the conveyance of title that determines legal ownership. It is the legal acquisition of the home that allows him to alter it. Whether the owner actually physically moves in and uses the house is not relevant. Acquisition happens when title passes—not when the owner moves in—in other words, acquisition happens upon legal, not physical, possession.

Here, when we apply the meaning of the word "acquire," Berrylane's acquisition of the warehouse occurred either when it signed the lease on January 8, 2015 or when the lease took effect on February 1, 2015. Either date is before the Policy period began in April 2015, and either date precludes recovery under the Policy.

The warehouse lease agreement[2] itself also suggests that Berrylane acquired the warehouse when the agreement became effective, not when it began using it. First, the lease indicated that

---

[2] Berrylane argues that TIC cannot rely on the lease agreement in support of its 12(b)(6) motion because it was not attached to the complaint. This is incorrect for two reasons. First, this court has held that in reviewing a 12(b)(6) motion, it "primarily considers allegations in the complaint, although matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint may be taken into account." *Amini v. Oberlin College*, 259 F.3d 493, 502 (6th Cir. 2001) (quotation omitted). The lease agreement appears in the record of the case, and can therefore be considered in support of the 12(b)(6) motion.

Second, this court has held that "documents that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to her claim." *Weiner v. Klais & Co.*, 108 F.3d 86, 89 (6th Cir. 1997) (quotation omitted). TIC attached the lease agreement in its reply in support of its motion to dismiss. Berrylane indirectly refers to the lease agreement by claiming that "a thief broke into a warehouse located at 2602 NW 72nd Avenue, Doral Florida, and stole iPhones belonging to Berrylane," and

Berrylane was in "full and complete possession" of the warehouse as of the time the agreement became effective. DE 21-1, Lease Agreement, Page ID 464 ("Tenant is in full and complete possession of the Property and has accepted the Property including any tenant improvements or other work of Owner performed thereon pursuant to the terms and provisions of the Lease, and the Property is in compliance with the Lease."). There is no evidence that suggests that Berrylane accrued any new rights with regard to the warehouse in the time between when the lease became effective in February 2015 and when it began using the warehouse in summer 2015. Second, the lease agreement made Berrylane's right to "peaceful possession" of the warehouse contingent upon paying rent, not upon actual use. DE 21-1, Lease Agreement, Page ID 456 ("Landlord agrees that Tenant, upon paying the base and additional rent, shall and may peacefully have, hold and enjoy the Premises above described, without hindrance or molestation by Landlord. Landlord shall not interfere with Tenant's quiet enjoyment of the demised Premises."). This suggests that the agreement contemplated that Berrylane would acquire the warehouse when the lease took effect. Third, the lease agreement notes that Berrylane must have insurance for the property "during the lease term." DE 21-1, Lease Agreement, Page ID 455 ("Tenant shall, during the Lease Term, procure at its expense and keep in force the following insurance. . . ."). The agreement's linkage of the requirement for insurance coverage to the lease term, rather than Berrylane's actual use of the warehouse, further indicates that Berrylane's acquisition of the warehouse occurred when the lease took effect.

Moreover, the Endorsement language suggests that Berrylane acquired the warehouse when the lease took effect, rather than when Berrylane began using it. The Endorsement applied to newly acquired property that Berrylane "acquire[s] *by purchase or lease*," which by its very

---

Berrylane's lease agreement is central to its claim because the Endorsement covers locations that "you acquire by purchase or lease." Thus, this court may consider the lease agreement in reviewing the 12(b)(6) motion.

terms indicates that the Policy contemplated that acquisition occurs "by purchase or lease," not through physical possession. DE 8-5, Newly Acquired Endorsement, Page ID 374 (emphasis added). Thus, both the lease agreement and Endorsement suggest that Berrylane acquired the warehouse when the lease became effective. And because Berrylane acquired the warehouse before the Policy period began, the district court correctly found that the Endorsement did not cover loss at the warehouse.

D.

In the alternative, Berrylane argues that the meaning of the word "acquire" is ambiguous and that this court should therefore construe the contract against TIC and reverse the dismissal. Berrylane is correct that if the meaning of "acquire" is ambiguous, this court should construe the provision in favor of Berrylane. *See King v. Nationwide Ins. Co.*, 519 N.E.2d 1380, 1383 ("[I]t is well-settled that, where provisions of a contract of insurance are reasonably susceptible of more than one interpretation, they will be construed strictly against the insurer and liberally in favor of the insured."). This analytical approach does not apply, though, when an insurance holder provides an unreasonable interpretation of the policy. *See Westfield Ins. Co. v. Galatis*, 797 N.E.2d 1256, 1262 (Ohio 2003) ("Although, as a rule, a policy of insurance that is reasonably open to different interpretations will be construed most favorably for the insured, that rule will not be applied so as to provide an unreasonable interpretation of the words of the policy." (quotation omitted)).

Based on the preceding analysis, the contract is not ambiguous. A contract can be "poorly drafted" yet ultimately unambiguous. *See On-Site Fasteners and Construction Supplies, Inc. v. Mapfre Ins. Co.*, 82 So. 3d 1001, 1003 (Fla. Dist. Ct. App. 2011) (holding that although newly acquired clause was "somewhat poorly drafted," it still unambiguously applied to business personal property at newly acquired locations). Thus, although this contract provision might be

"poorly drafted," this court has no obligation to construe it in favor of Berrylane because it is not ambiguous.

But even if the meaning of acquire is ambiguous, Berrylane's interpretation is unreasonable. The purpose of a Newly Acquired provision is to provide a temporary safeguard to cover new property acquired during the policy period that would otherwise be uninsured. If the provision covered new property at *any* location—even properties the insurance holder has already owned for years—there would be little incentive to include multiple locations on a schedule of locations. Rather, the insurance holder could pay a premium on only one location but continually reap benefits for other locations should loss occur elsewhere. This conflicts with the notion of insurance as a gamble that both parties enter into ahead of time: the insurance holder gambles that paying an insurance premium is worth it because loss may occur, and the insurance company gambles that the risk will never come to fruition. Extending an Endorsement to cover new property at *any* location removes the fundamental gamble that both parties make when they enter into the contract because it eliminates the requirement to decide on the front end which locations will be covered. Thus, Berrylane's proposed interpretation is unreasonable.

E.

Lastly, Berrylane argues that the district court erred in determining that Berrylane's failure to notify TIC when it acquired the warehouse precluded it from seeking recovery under the Policy. We decline to reach this issue because it is unnecessary to resolve the dispute at hand.

IV.

For the reasons stated, we affirm the district court's dismissal of Berrylane's complaint for failure to state a claim under Fed. R. Civ. P. 12(b)(6).