NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 14a0847n.06

No. 14-1027

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

FILED
Nov 12, 2014
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| KALITTA AIR, LLC, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE EASTERN |
| GSBD & ASSOCIATES, *et al.*, | ) | DISTRICT OF MICHIGAN |
| | ) | |
| Defendants-Appellees. | ) | |

BEFORE: SUTTON and KETHLEDGE, Circuit Judges; ROSENTHAL, District Judge.[*]

ROSENTHAL, District Judge. A company contracted to buy jet fuel for its air-cargo business from a supplier that allegedly touted its ability to discount the price through its connections with international banks and with the Saudi royal family. Months and millions of dollars later, the purchaser discovered that the supplier violated the contract terms requiring the purchase money to stay in an escrow account until the fuel was delivered, and that out of the approximately $29 million deposited in the escrow account, the purchaser received only $25 million in fuel. The purchaser sued, asserting federal RICO claims and state-law claims for breach of contractual and other duties, conversion, and the like. The district court granted the defendants' motion to dismiss the RICO claims, finding that the complaint failed to allege a pattern of racketeering activity; declined to

---

[*] The Honorable Lee H. Rosenthal, United States District Judge for the Southern District of Texas, sitting by designation.

-1-

continue to exercise jurisdiction over the remaining state-law claims; and dismissed. We find that the complaint did state a RICO claim, and we reverse and remand.

## I.     The Complaint[1]

Kalitta Air, LLC purchases over $200 million of jet fuel each year. On January 12, 2009, William Gray, who had been a Kalitta executive in the late 1980s and early 1990s, telephoned Kalitta's general counsel to propose that Kalitta buy jet fuel from Gray's new company, GSB. Gray and two others, including Garth Gottschalk, had recently formed GSB to sell jet fuel at discounted prices by eliminating the middle-man and purchasing directly from the refinery. Gray assured Kalitta's counsel that GSB had the financial strength to buy large amounts at a discount because Gottschalk had connections with a strong international lender, The Atlantic Bank, and with an international escrow agent, First International Exchange Corporation. Gray telephoned again on February 5 and 9 to discuss a purchase agreement, repeating the statements about GSB's financial strength from its relationships with The Atlantic Bank and First International.

On May 14, 2009, Gray and Gottschalk met with Kalitta's CEO and general counsel at Kalitta headquarters. Gray and Gottschalk promised that Kalitta could save millions of dollars each year buying jet fuel from GSB. They emphasized GSB's ties to The Atlantic Bank and First International, which they explained had connections to the Saudi royal family and its access to fuel refineries.

---

[1] "The following fact summary is based on the allegations of [Kalitta's] Amended Complaint, which we accept as true in reviewing the district court's ruling on [the] Defendants' motions to dismiss." *Heyne v. Metro. Nashville Pub. Schs.*, 655 F.3d 556, 559 n.1 (6th Cir. 2011).

Gray met with Kalitta executives again on May 28 and June 13, and both Gray and Gottschalk talked by telephone with Kalitta executives several times between June 23 and July 15, continuing to emphasize GSB's financial stability and access to cheap jet fuel.

On July 15, 2009, Kalitta and GSB signed a Jet Fuel Purchase Agreement (the "Purchase Agreement") and an Escrow Agreement. Kalitta agreed to wire money on a monthly basis into an escrow account at First International to pay GSB's invoices for jet-fuel shipments. First International agreed to hold the money until it received written confirmation that GSB had delivered the jet fuel to Kalitta. When First International received this confirmation, it would release the money to GSB. The contracts would renew each year unless either Kalitta or GSB gave a 60-day notice of cancellation.

On August 10, 2009, Kalitta received its first invoice from GSB, for roughly $3.5 million. Kalitta wired the money to the escrow account the next day. On August 13, First International transferred the money out of the account, without Kalitta's knowledge or permission and in violation of the Escrow Agreement. On August 26, GSB wired roughly $822,000 to Kero-Jet, and on August 28, wired just over $16,000 to Buckeye Pipe Line Company. Kalitta did get the fuel, but not until August 30. And although GSB had wired Kero-Jet enough of Kalitta's money to buy 10,000 barrels of fuel at the quoted prices, GSB delivered Kalitta only 7,500 barrels.

On September 23, 2009, First International sent Kalitta a "Bank Comfort Letter" stating that GSB was "a client in good standing" with a "'Petroleum Products' credit line of $500,000,000.00 USD" and "attest[ing] on the behalf of GSB" that "they are Ready, Willing and Financially Capable to proceed with approved purchase offers up to their line of credit." R. 42-3.

Between September 2009 and February 2010, GSB sent Kalitta invoices ranging from $2.3 million to $4.7 million. During this period, GSB and Kalitta representatives had more telephone conversations in which GSB continued to tout its ties to the Saudi royal family.

Between August 2009 and March 2010, Kalitta made 10 deposits into the escrow account, totaling $28,928,330. After each deposit, but before Kalitta received the jet-fuel shipments, First International wired the money out of the escrow account to different recipients. Kalitta identifies 19 wire transfers between August 2009 and March 2010 that it alleges violated the Escrow Agreement, the federal wire-fraud statute, 18 U.S.C. § 1343, and the federal money-laundering statute, 18 U.S.C. § 1956.

On March 10, 2010, Kalitta gave GSB the 60-day notice that it was terminating the Escrow and Purchase Agreements. Kalitta demanded that GSB pay approximately $4.3 million that Kalitta had deposited in the escrow account to pay for jet fuel it never received. Kalitta alleged that continued analysis later showed the shortfall to be closer to $4.7 million.

The defendants did not pay. Instead, First International wired nearly $3 million out of the escrow account over the next two months. The final withdrawal of roughly $47,000 occurred on May 27, 2010.

Although the escrow account was empty and the contracts terminated, GSB continued communicating with Kalitta. On January 13, 2011, Gray emailed allegedly "phony" Kero-Jet invoices to Kalitta showing that the shortfall resulted in part from Kero-Jet's failure to pay GSB, not GSB's own misconduct. R. 42 ¶ 76. In a May 17, 2011 email, Gottschalk told Kalitta that its account would be replenished once he closed pending deals with "the Indonesians and the Chinese among others." *Id.* Finally, on August 3, 2011—roughly 32 months after Gray first telephoned

Kalitta in January 2009—Gottschalk emailed Kalitta stating that GSB was closing deals the "next week" that would allow Kalitta to resume purchasing jet fuel from GSB. *Id.* ¶ 77; R. 42-13 at 3. The record does not indicate whether Kalitta responded to the invoices or emails.

In August 2012, Kalitta filed this action in the Eastern District of Michigan, asserting federal RICO claims based on violations of 18 U.S.C. § 1962(c) and (d). Kalitta alleged several predicate acts of mail fraud, wire fraud, and money laundering over a 32-month period, resulting in a roughly $4.7 million loss. Besides GSB—the alleged RICO enterprise—Kalitta named William Gray, the William Gray Trust, Garth Gottschalk, Cree Enterprises LLC, Scott Westman, Dhafir Dalaly, First International Exchange Corp., First International Exchange Group, and the Law Offices of Hamood & Fergestrom as defendants in the RICO claims. Kalitta also alleged state-law claims for statutory and common-law conversion, fraud and fraudulent inducement, breach of contract, breach of fiduciary duty, conspiracy, and concert of action.

In the complaint, Kalitta alleged that the fraudulent scheme was GSB's and First International's "regular way of doing business" and that the companies continue to pose a threat to unsuspecting victims. R. 42 ¶ 78. Kalitta alleged that GSB and First International remain operational and in good standing, and that although the State of Michigan enjoined First International from operating its website, www.atlanticbankinc.com, finding that First International falsely held itself out as a bank, the website is still up, under First International's control, with a different domain name.

Kalitta also alleged that GSB and First International used the same scheme of making false representations to get a company to set up an escrow account with First International, taking money from the escrow account before they were entitled to do so, and taking more money than they were

entitled to receive, to defraud another air carrier buying jet fuel.  The complaint alleged that in July 2009, Arrow Air signed a jet-fuel purchase agreement with GSB and an escrow agreement with First International, similar to Kalitta's.[2]  Like Kalitta, Arrow Air deposited money into the escrow account to purchase discounted fuel.  As with Kalitta, First International released the money to GSB before delivering the jet fuel Arrow Air had purchased.  Arrow Air sued GSB and First International in the Southern District of Florida for breach of contract and other state-law causes of action, and received a stipulated judgment of approximately $2.7 million.

Kalitta also alleged that Dalaly and First International defrauded 22 other victims through a scheme involving home mortgages.  Kalitta cited pleadings in *Avis v. Dalaly*,[3] a RICO action filed in Michigan federal court.  Kalitta alleged that some of the funds the defendants diverted from Kalitta's jet-fuel escrow account were used to refinance one victim's mortgage.

The district court entered default against five defendants who had failed to answer or otherwise respond, including one defendant named in the RICO claims.[4]  The remaining defendants moved to dismiss the RICO claims in Kalitta's amended complaint for failure to state a claim, then to dismiss the state-law claims based on the dismissal of the only federal claims.  The defendants argued that the RICO claims failed because the amended complaint failed to allege facts showing a pattern of racketeering activity.  The district court agreed that Kalitta had failed to allege facts showing either the closed-ended or open-ended continuity required under *H.J. Inc. v. Northwestern*

---

[2] *See In re Arrow Air, Inc.*, Nos. 10-28831-BKC-AJC, 10-28834-BKC-AJC, 10-3598-BKC-AJC-A (Bankr. S.D. Fla.).

[3] No. 2:11-cv-10108-AC-MJH (E.D. Mich.).

[4] These defendants were Sheldon Sandweiss, Scottfuel LLC, Cynthia Westman, Scott Westman, and GSB.  Of the five, only Scott Westman and GSB were named in the RICO claims.  According to Kalitta, it "agreed to stipulate to an order setting aside the default of GSB[]" but "counsel for defendant" "never filed the order."  Aplt. Br. at 7 n.2.

*Bell Telephone Co.*, 492 U.S. 229, 239-41 (1989). In that case, the Supreme Court held that closed-ended continuity requires predicate acts over a "substantial period of time," because RICO is concerned with "long-term criminal conduct," while open-ended continuity may be established by showing "a distinct threat of long-term racketeering activity" or that the predicate acts or offenses are part of an ongoing entity's "regular way of doing business." *Id.* at 241-42. The district court found that Kalitta had alleged predicate acts beginning with Gray's first phone call in January 2009 and continuing to the last wire transfer from the escrow account in May 2010, and concluded that 16 months was not long enough for a closed-ended pattern of racketeering activity. The district court also concluded that Kalitta's allegations about the threat of similar future schemes did not rise to the level of an open-ended pattern of racketeering because the scheme targeting Kalitta was a completed "one shot deal" and the allegations about other victims were insufficient. R. 103 at 8.

Kalitta moved for reconsideration, arguing that the district court had miscalculated the closed-ended period as 16 months instead of the 32 months alleged in the amended complaint. Kalitta also argued that in rejecting its open-ended continuity contentions, the district court had overlooked the allegations about other victims and the defendants' ongoing activities.

In October 2013, the district court denied the motion for reconsideration. Relying on *Moon v. Harrison Piping Supply*, 465 F.3d 719 (6th Cir. 2006), the court concluded that even the 32-month closed period was not "substantial." *See id.* at 725 ("[E]ven if the racketeering activity lasted for two-and-a-half years, as Moon insists, facts establishing a closed period of continuity are still lacking."). The court also stood by its conclusion that Kalitta had failed to allege open-ended continuity in the scheme against it because the facts showed a "built-in ending point." *Heinrich v. Waiting Angels Adoption Servs., Inc.*, 668 F.3d 393, 410 (6th Cir. 2012). Nor did the allegations

about the other victims show open-ended continuity, because one victim, Arrow Air, had not accused the defendants of RICO violations or fraud, and the other group of victims had suffered a different scheme that involved neither jet fuel nor an escrow account.

Having dismissed the RICO claims, the district court granted the motion to dismiss the remaining state-law claims. The court *sua sponte* dismissed the RICO claims against the defendant against whom default had been entered. Because no federal claims remained, the court declined to exercise supplemental jurisdiction under 28 U.S.C. § 1367(c)(3) (allowing a court to decline jurisdiction over state-law claims if it "has dismissed all claims over which it has original jurisdiction"). As to the defendant who had defaulted, the district court issued alternative rulings under 28 U.S.C. § 1367(c)(2) & (c)(4), which allow a court to decline supplemental jurisdiction if the state-law claims "substantially predominate[] over the claim or claims over which the district court has original jurisdiction" or "exceptional circumstances" present "other compelling reasons for declining jurisdiction."

Kalitta appealed both the dismissal for failure to state a RICO claim and the refusal to exercise supplemental jurisdiction over the state-law claims. We have jurisdiction under 28 U.S.C. § 1291.

## II.    The RICO Claims

### A.    The Standard of Review and Applicable Law

We review the district court's dismissal of Kalitta's RICO claims under Rule 12(b)(6) *de novo*. *Ouwinga v. Benistar 419 Plan Servs., Inc.*, 694 F.3d 783, 790 (6th Cir. 2012). "In assessing a complaint for failure to state a claim, we must construe the complaint in the light most favorable to the plaintiff, accept all well-pled factual allegations as true, and determine whether the complaint

-8-

'contain[s] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

The RICO statute states that "any person employed by or associated with any enterprise engaged in . . . interstate or foreign commerce" may be subject to criminal and civil liability if he or she "conduct[s] or participate[s], directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c). The statute's civil remedies provision allows private plaintiffs "injured in [their] business or property by reason of a violation" of the statute to sue in federal court and "recover threefold the damages [they] sustain[]" as well as the "cost of the suit, including a reasonable attorney's fee . . . ." 18 U.S.C. § 1964(c).

"[T]o state a [civil] RICO claim, [a plaintiff] must plead the following elements: '(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity.'" *Moon*, 465 F.3d at 723 (quoting *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 496 (1985)). The parties dispute whether Kalitta's amended complaint sufficiently alleged a "pattern" of racketeering activity, which "requires at least two acts of racketeering activity," the last of which must, excluding any period in prison, be within ten years of the first. 18 U.S.C. § 1961(5) (quotations omitted).

In *H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229 (1989), the Supreme Court held that although "two acts are necessary, they may not be sufficient." *Id.* at 237 (quotations omitted); *see also Brown v. Cassens Transp. Co.*, 546 F.3d 347, 354 (6th Cir. 2008). "Beyond setting forth the minimum number of predicate acts required to establish a pattern," the statute "'assumes that there is something to a RICO pattern *beyond* simply the number of predicate acts involved.'" *Brown*, 546 F.3d at 354 (quoting *H.J. Inc.*, 492 U.S. at 238). "Within the numerous

sorts of relationships that can constitute a pattern, two elements must be shown: 'that the racketeering predicates are [1] *related*, *and* that [2] they amount to or pose a threat of *continued* criminal activity.'" *Id.* (quoting and emphasizing *H.J. Inc.*, 492 U.S. at 239). The parties do not dispute that the predicate acts Kalitta alleges are sufficiently related. The issue is continuity.

"'Continuity' is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." *H.J. Inc.*, 492 U.S. at 241. "Continuity may be established at the pleading stage by alleging facts of either closed- or open-ended racketeering activity." *Moon*, 465 F.3d at 724.

"A party alleging a RICO violation may demonstrate continuity over a closed period by proving a series of related predicates extending over a substantial period of time. Predicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement" because "Congress was concerned in RICO with long-term criminal conduct." *H.J. Inc.*, 492 U.S. at 242; *see also Vemco, Inc. v. Camardella*, 23 F.3d 129, 134 (6th Cir. 1994) (predicate acts over 17-month period did not satisfy closed-period analysis); *Vild v. Visconsi*, 956 F.2d 560, 569 (6th Cir. 1992) (six- to seven-month period not sufficient).

When circumstances interrupt the predicate activity or a plaintiff brings a RICO action "before continuity can be established in this way," "liability depends on whether the *threat* of continuity is demonstrated"—that is, whether continuity is "open-ended." *H.J. Inc.*, 492 U.S. at 242. "Determining whether open-ended continuity has been established requires a court to probe 'the specific facts of each case.'" *Brown*, 546 F.3d at 354 (quoting *H.J. Inc.*, 492 U.S. at 242).

Open-ended continuity may be present "if the related predicates themselves involve a distinct threat of long-term racketeering activity, either implicit or explicit." *H.J. Inc.*, 492 U.S. at 242.

-10-

"Even when 'the number of related predicates involved may be small and they may occur close together in time,' if 'the racketeering acts themselves include a specific threat of repetition extending indefinitely into the future,' this 'suppl[ies] the requisite threat of continuity.'" *Brown*, 546 F.3d at 354 (quoting *H.J. Inc.*, 492 U.S. at 242). "In other cases, the threat of continuity may be established by showing that the predicate acts or offenses are part of an ongoing entity's regular way of doing business." *H.J. Inc.*, 492 U.S. at 242. "Thus, the threat of continuity is sufficiently established where the predicates can be attributed to a defendant operating as part of a long-term association that exists for criminal purposes." *Id.* at 242-43.

One consideration is whether a complaint alleges "an inherently terminable scheme—a pattern of racketeering activity with a built-in ending point." *Heinrich*, 668 F.3d at 410. The plaintiffs' allegations must "support a systematic threat of ongoing fraud." *Moon*, 465 F.3d at 728. At the same time, "'the threat of continuity need not be established solely by reference to the predicate acts alone'"; "'facts external to the predicate acts may, and indeed should, be considered.'" *Brown*, 546 F.3d at 355 (quoting *United States v. Busacca*, 936 F.2d 232, 238 (6th Cir. 1991)).

## B.    Discussion

Kalitta contends that its amended complaint adequately alleged both closed- and open-ended continuity. Because we conclude that Kalitta's amended complaint alleges sufficient facts to raise a plausible inference of open-ended continuity, we need not address whether its allegations of closed-ended continuity also satisfy RICO's pattern requirement. *See Moon*, 465 F.3d at 724 ("Continuity may be established at the pleading stage by alleging facts of either closed- or open-ended racketeering activity.").

-11-

To state a RICO claim based on open-ended continuity, Kalitta "must plausibly allege that there was a threat of continuing criminal activity beyond the period during which the predicate acts were performed." *Heinrich*, 668 F.3d at 410. Kalitta may do this by factual allegations "showing that the predicate acts or offenses are part of an ongoing entity's regular way of doing business." *H.J. Inc.*, 492 U.S. at 242. The amended complaint does that. If proven, Kalitta's well-pleaded factual allegations of the predicate acts, of another victim of a very similar scheme, and of the continued operation of GSB and First International, combine to support a plausible inference that GSB—the alleged RICO enterprise—used these and similar predicate acts as its "regular way of doing business" and that it and the other defendants remain a threat to others.

The defendants argue that once Kalitta terminated the agreement in March 2010 and the defendants emptied the escrow account by May 2010, there was no risk of continued criminal activity because "the alleged scheme was over." Br. of Appellee (Gray) at 14. "'[I]n the context of an open-ended period of racketeering activity, the threat of continuity must be viewed at the time the racketeering activity occurred,'" making "[s]ubsequent events [] irrelevant to the continuity determination." *Heinrich*, 668 F.3d at 410 (quoting *Busacca*, 936 F.2d at 238); *see also id.* ("'The lack of a threat of continuity of racketeering activity cannot be asserted merely by showing a fortuitous interruption of that activity such as by an arrest, indictment or guilty verdict.'" (quoting *Busacca*, 936 F.2d at 238)); *Moon*, 465 F.3d at 729 (Moore, J., concurring) (stating that the court should not consider events after the alleged predicate acts ended in deciding whether a long-term racketeering activity threat has been properly alleged). While allegations that defendants breached an open-ended contract do not by themselves, or necessarily when combined with other allegations,

state a RICO claim, the allegations in Kalitta's amended complaint go beyond those asserting a mere contract dispute.

When the alleged racketeering activities occurred in this case, GSB and the defendants could well have kept this scheme going. Kalitta had an evergreen contract with GSB that renewed every year unless terminated. GSB allegedly committed numerous predicate acts from January 2009 until Kalitta gave the 60-day termination notice in March 2010 after discovering the discrepancy between the fuel it paid for and the fuel it received. *Heinrich*, 668 F.3d at 410. Although either party could terminate on 60-days' notice, the agreement could have continued indefinitely but for the fortuity of Kalitta's discovery. *See Blue Cross & Blue Shield of Michigan v. Kamin*, 876 F.2d 543, 545 (6th Cir. 1989) (finding that continuity was established because there was no reason to believe that, if the defendant had not been caught, he would no longer be submitting fraudulent insurance claims). The discovery was indeed fortuitous because, as the amended complaint alleged, the "unique aspects of jet fuel pricing and weight calculations" make such fuel-delivery shortfalls hard to detect. R. 42 ¶ 50.

The amended complaint also alleged that, even after the contracts ended, the defendants stripped the escrow account and sent invoices and emails with false statements to get Kalitta to resume the arrangement. Kalitta's allegations about the defendants' activities after March 2010, at a minimum, belie the defendants' assertion that the racketeering activity ended with the contract termination.

The district court erred in concluding that the defendants' scheme had a "'built-in ending point,' namely, when the escrow account was depleted." R. 103 at 9 (quoting *Heinrich*, 668 F.3d at 410). Nothing about GSB's arrangement with Kalitta was "inherently terminable." *Heinrich*,

668 F.3d at 410. The cases in which this court has rejected a plaintiff's allegations of open-ended continuity based on a single scheme with a built-in endpoint involved schemes that were necessarily finite. In *Thompson v. Paasche*, 950 F.2d 306 (6th Cir. 1991), for example, the defendant's land scheme "was an inherently short-term affair" because "[h]e had nineteen lots to sell" and "[o]nce he sold all of the lots, the scheme was over." *Id.* at 311. Similarly, in *Vemco, Inc. v. Camardella*, 23 F.3d 129 (6th Cir. 1994), the defendant's scheme concerned "a single construction job" and the plaintiff pleaded "no facts . . . suggesting anything but that once [the defendant] received the money it was requesting in the billing statements, its scheme would be over, and it would end its association with [the plaintiff]." *Id.* at 135. Finally, in *Vild v. Visconsi*, 956 F.2d 560 (6th Cir. 1992), although the "acts alleged amount[ed] at best to a breach of contract with a single customer," the defendants' scheme fraudulently "induce[d] [the plaintiff] to sign a marketing agreement to sell *real estate interests* in the Club," a "real estate resort venture" with limited supply. *Id.* at 563, 569 (emphasis added).

Kalitta also alleged another similarly situated victim—Arrow Air.[5] Like Kalitta, Arrow Air signed a year-to-year Jet Fuel Purchase Agreement and an Escrow Agreement with GSB to buy discounted jet fuel. Arrow Air wired money into an escrow account operated by International Exchange. Arrow Air's money was diverted from the account without its permission and in violation of its Escrow Agreement. And while Arrow Air received some jet fuel in exchange for these payments, like Kalitta, it did not receive all of the fuel it paid for. The district court discounted

---

[5] The amended complaint also alleged 22 other victims of the mortgage-fraud scheme alleged in the *Avis* complaint. That scheme was different from a jet-fuel purchase arrangement using an escrow account to get money, and GSB was not involved. *See Vild*, 956 F.2d at 570 ("A civil plaintiff may not use one type of conduct (acts directed at him) to satisfy the relationship test, and then invoke a second type of conduct (unrelated acts directed at others) to fulfill the continuity test absent similar types of conduct and victims who are essentially in the same position.").

Kalitta's allegations about Arrow Air, reasoning that it had not alleged RICO predicate acts in the breach-of-contract lawsuit it filed against the defendants. But Arrow Air's choice of whether to allege fraud or RICO claims in its own lawsuit does not foreclose Kalitta's RICO claims in its action. Kalitta's allegations that GSB and other defendants used an escrow account to supply Arrow Air with less jet fuel than it paid for and to get the money earlier than the contract allowed make it plausible that Arrow Air was a victim of the same racketeering activity that deceived Kalitta and cost it $4.7 million. *See Heinrich*, 668 F.3d at 410 ("The threat of continuing racketeering activity need not be established, however, exclusively by reference to the predicate acts alone; rather, a court should consider the totality of the circumstances surrounding the commission of those acts."); *cf. Vemco*, 23 F.3d at 135 (no open-ended continuity when there was "no allegation that [the defendant] engaged in similar practices on other contracts involving other parties"); *Vild*, 956 F.2d at 569 (no open-ended continuity absent any "allegation that defendants continued to threaten and defraud him or threatened and defrauded others in similar marketing agreements").

Accepting Kalitta's well-pleaded factual allegations as true, a jury could plausibly infer that the scheme used against it and Arrow Air was the defendants' "regular way of doing business" and could have continued indefinitely.

Kalitta's amended complaint plausibly alleged that the defendants engaged in an open-ended pattern of racketeering activity. The district court erred in dismissing Kalitta's RICO claims.[6]

---

[6] This includes Kalitta's claim that the defendants conspired to violate RICO, *see* 18 U.S.C. § 1962(d). *See Heinrich*, 668 F.3d at 411 ("Because the plaintiffs have adequately alleged both an underlying RICO violation and an agreement to participate in this violation, we find that the third amended complaint does state a claim upon which relief can be granted under 18 U.S.C. § 1962(d).").

**III.     The State-Law Claims**

Kalitta argues that the district court abused its discretion in dismissing its RICO claims against the defaulted defendants and refusing to exercise supplemental jurisdiction over the remaining state-law claims.  Because we conclude that the district court erred in dismissing Kalitta's federal RICO claims against both the defaulted and nondefaulted defendants, it abused its discretion in declining supplemental jurisdiction under 28 U.S.C. § 1367(c)(3), which applies only if the court has "dismissed all claims over which it has original jurisdiction."[7]

**IV.     Conclusion**

We reverse and remand for further proceedings consistent with this opinion.

---

[7] We leave for the district court to determine on remand whether one of 28 U.S.C. § 1367(c)'s other exceptions still applies.