NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 19a0181n.06

No. 16-6660

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

FILED

Apr 09, 2019

DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| ACES HIGH COAL SALES, INC.; WENDELL ELZA, | ) ) ) | |
| Plaintiffs-Appellants, | ) ) | On Appeal from the United States District Court for the Eastern District |
| v. | ) ) | of Kentucky |
| COMMUNITY BANK & TRUST OF WEST GEORGIA; WILLIAM R. STUMP, JR., individually and as officer and director of CB&T; TAYLOR ROSE ENERGY, LLC; BRANSEN ENERGY, INC.; KYLE TOMLIN; RIVERSIDE ADVISORS, LLC; MICHAEL PETERS; TROUTMAN SANDERS, LLP; MICHAEL E. JOHNSON, ESQ., | ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants-Appellees. | ) | |

_____/

**Before: GUY, WHITE, and STRANCH, Circuit Judges.**

**RALPH B. GUY, JR., Circuit Judge.** Plaintiffs appeal the district court's dismissal of the civil RICO claims asserted in this action for failure to plausibly allege: (1) "a pattern of racketeering activity" sufficient to satisfy 18 U.S.C. § 1962(c); (2) an "acquisition injury" required for a claim under 18 U.S.C. § 1962(b); or (3) any substantive RICO violation that could support a conspiracy claim under 18 U.S.C. § 1962(d). Some of the defendants also argue that the RICO

claims fail because plaintiffs did not allege an injury to "business or property by reason of" a RICO violation as required by 18 U.S.C. § 1964(c). For the reasons that follow, the dismissal of plaintiffs' civil RICO claims is **AFFIRMED**.

## I.

Aces High Coal Sales, Inc., and its manager Wendell Elza ("Plaintiffs"), filed a ten-count complaint alleging civil RICO violations and asserting several state-law tort claims. The district court dismissed the RICO claims in November 2016 for failure to state a claim and declined to exercise jurisdiction over the remaining claims. In July 2017, addressing the parties' motions to alter or amend judgment, the district court recognized its diversity jurisdiction but dismissed the state-law claims on the merits.

Plaintiffs filed a timely appeal from the November 2016 Order of dismissal pursuant to Fed. R. Civ. P. 12(b)(6), but did not file a new or amended notice of appeal from the July 2017 Order resolving the motions to alter or amend judgment under Fed. R. Civ. P. 59(e). As a result, issues raised for the first time after entry of the November 2016 Order are beyond the scope of this appeal. *See Gruener v. Ohio Cas. Ins. Co.*, 510 F.3d 661, 665-66 (6th Cir. 2008); *Rogers v. City of Warren*, 302 F. App'x 371, 376 (6th Cir. 2008) ("[A] party must amend its notice of appeal to include an order denying a motion for reconsideration if the party intends to rely on that post-judgment motion as a basis for its appeal."). But, "[t]o the extent that the post-judgment motions relate to issues raised before judgment, the appellate court will deal with them anyway." *Caudill v. Hollan*, 431 F.3d 900, 906 (6th Cir. 2005); *see also Dice Corp. v. Bold Techs.*, 556 F. App'x 378, 383 (6th Cir. 2014) ("[I]ssues raised before the last appealed judgment will be considered, issues raised after will not."). In fact, plaintiffs abandoned arguments seeking reinstatement of two state-law claims that were dismissed on grounds reached for the first time in the July 2017

Order.   (Pls' Reply Br., p. 15. n.2.) ("Plaintiffs concede that the defamation and tortious interference claims against the Troutman Sanders Defendants are barred.")

Some of the defendants, however, mistakenly argue that plaintiffs' failure to appeal the July 2017 Order should have preclusive effect with respect to plaintiffs' RICO claims. which were dismissed in the November 2016 Order.  (Peters Defs' Br., pp. 14-19; CB&T Defs' Br., pp. 16-24.)  "Issue preclusion addresses the effect in a current case of a prior adjudication *in another case.*"  *Currier v. Virginia*, 138 S. Ct. 2144, 2154 (2018).  Further, these same defendants assert that failure to appeal the later order could or should alter this court's applicable standard of review.  On the contrary, notwithstanding the overlap of issues addressed in the two orders, we review the properly appealed dismissal of plaintiffs' RICO claims *de novo*.  Moreover, an appeal from the denial of a Rule 59(e) motion asserting legal error would also be reviewed *de novo*.  *See Huff v. Metro. Life Ins. Co.*, 675 F.2d 119, 123 n.5 (6th Cir. 1982) ("[W]hen the lower court rejects an application under Rule 59(e) based upon an erroneous legal doctrine, our standard of review is the same as in other cases of legal error.").  With these parameters in mind, we summarize the facts that are the basis of the RICO claims in Counts 2, 3, and 4 of the Second Amended Complaint.

**II.**

The substantive RICO claims in Counts 2 and 3 were asserted against two groups of related defendants:  Michael Peters and his two companies Bransen Energy, Inc. and Taylor Rose Energy, LLC ("Peters Defendants"); and Kyle Tomlin and his investment business Riverside Advisors, LLC ("Tomlin Defendants").  Peters was alleged to be an officer, director, owner or manager of both Bransen Energy and Taylor Rose.  Bransen Energy was an investor in Taylor Rose and, from some unspecified point in time, the Tomlin Defendants were also investors in Taylor Rose.  The RICO conspiracy claim in Count 4 was asserted against those defendants as well as a lender and

its lawyers—namely, Community Bank & Trust of West Georgia (CB&T) and its officer and director William Stump, Jr. ("Bank Defendants"); and Troutman Sanders, LLP, and one of its partners Michael Johnson, Esq. ("Troutman Sanders Defendants).

Plaintiffs were in the business of buying and selling coal and financing the purchases of coal by third parties. Elza was first introduced to Peters in late 2010 or early 2011. Peters touted his business contacts with Dominion Virginia Power ("Dominion"), which was preparing to build a new coal-fired power plant. In fact, a master agreement had already been signed between Dominion and Bransen Energy. Plaintiffs alleged that, unbeknownst to Elza, predicate acts of mail and wire fraud were committed as part of a scheme to defraud Dominion.[1]

### A.       Dominion "Coke Breeze" Fraud

In January 2011, Dominion contracted with Bransen Energy for the purchase of 450,000 tons of "Run-of-Mine" coal, with an option to purchase an additional 150,000 tons, to be stockpiled at a site in Wakenva, Virginia. Bransen Energy, in turn, contracted with Aces High for the purchase of coal that was intended for Dominion. Aces delivered coal weekly, invoiced Bransen Energy for "hundreds of thousands of tons of coal," and was paid in full. Plaintiffs do not allege they were defrauded in that deal. In fact, according to plaintiffs, Elza and Peters became personal friends; Aces and Bransen Energy "engaged in a large volume of business in the ensuing years"; and, until late in 2014, Elza believed Peters to be "highly connected, reliable and trustworthy."

Dominion was allegedly defrauded when Peters separately purchased "Coke Breeze"—a coal by-product that did not meet Dominion's specifications—and had it mixed into the coal being stockpiled for Dominion. Dominion was alerted to the Coke Breeze in late 2011 and interviewed

---

[1]The introduction of Elza and Peters was made by their mutual business acquaintance Michael Trimble of Trimble Coal Sales, LLC, who does not reappear in this story until January 2015. Trimble appealed the dismissal of an intervening complaint for declaratory judgment, but that appeal has been voluntarily dismissed.

Peters about it in February 2012. Elza saw Coke Breeze being mixed in, but "had no reason to know that such conduct violated the contract between Bransen Energy and Dominion, or that it may have constituted fraudulent activity."

Without detailing the deterioration of the relationship between Bransen and Dominion that followed, plaintiffs alleged that the loss of Dominion's business created financial difficulties for the Peters Defendants. In late July 2014, Dominion finally sent written notice of the defaults by Bransen, terminated its contracts with Bransen, and commenced litigation against Bransen. Dominion did not pursue claims of fraud in that case, but Dominion prevailed on its breach of contract claims against Bransen. *See Va. Elec. & Power Co. v. Bransen Energy, Inc.*, 850 F.3d 645 (4th Cir. 2017) (affirming judgment of more than $1.9 million related to the delivery of "Coke Breeze" and nearly $21 million for delivery of other non-conforming coal).[2]

## B.     CB&T Loan, "Cannel Coal," and Scams against Plaintiffs

The next phase of the alleged pattern of racketeering activity began with a loan from CB&T in July 2014 and was followed by a series of frauds against plaintiffs between November 2014 and January 2015. Plaintiffs claimed a cumulative loss from those scams of $1.4 million as of January 2015.

*CB&T Loan.* In July 2014, Taylor Rose obtained a loan for $9 million from CB&T that was guaranteed by the USDA. That loan was secured, in part, by Taylor Rose's leasehold on property in Dixie, West Virginia, and tons of "Cannel Coal"—a type of hard coal—that was being stored there. Plaintiffs alleged that the financial stress of the loss of the Dominion business caused

---

[2]The Peters Defendants assert that the Fourth Circuit's decision affirming the judgment against Bransen "with no findings whatsoever that Bransen defrauded Dominion," somehow renders the allegations of fraud in this case "non-plausible." (Peters Defs' Br., p. 22.) No attempt has been made, however, to establish that claim preclusion would apply. *See Bittinger v. Tecumseh Prods. Co.*, 123 F.3d 877, 880 (6th Cir. 1997) (elements of claim preclusion include the requirement that the subsequent action be "between the same parties or their 'privies'" (citation omitted)).

the Peters and Tomlin Defendants to commit fraud in securing the loan by failing to disclose either that Bransen was about to lose its contracts with Dominion or that Bransen was actively selling the Cannel Coal securing the loan. Plaintiffs also alleged that the Bank Defendants knowingly, recklessly, or negligently made the loan without conducting due diligence regarding its security interest in the Cannel Coal.

*Cannel Coal.* The Cannel Coal securing the 2014 loan was allegedly purchased in 2012. Specifically, in October 2012, Peters told Elza that he was buying 250,000 tons of Cannel Coal and would store it on property in Dixie, West Virginia. Plaintiffs claimed to have been unaware that Peters and Tomlin had worked together to finance the purchase. Peters told Elza that he planned to make the coal into briquettes to sell for home heating use in Ireland, but the briquettes were rejected by the purchasers in Ireland. In October 2013, Peters offered to sell Elza some of the Cannel Coal. Aces *prepaid* Bransen a total of $500,000 for 50,000 tons of the Cannel Coal to be picked up on a weekly basis from the Dixie location. Aces picked up prepaid Cannel Coal on a weekly basis until February 6, 2015. When that stopped, however, Aces was still owed tonnage valued at $189,608.40.

In a separate coal deal entered into in July 2014, Aces agreed to sell coal to Bransen that would be delivered to barges for transport to Bransen's customer Duke Power. The arrangement was that Aces would be paid after Duke received the coal and paid Bransen. In November 2014, however, Peters stopped paying Aces and falsely advised by text and telephone that Duke had not wired payment. In December 2014, Aces issued three invoices for unpaid shipments of coal to Duke Power. The invoices were not paid, and Aces was owed $364,476 as of January 2015.

*Two Scams.* Next, Peters fraudulently induced Elza to make two investments on the promise of immediate repayment and substantial short-term returns. Specifically, in late 2014,

Peters got Elza to advance $545,000 to complete a deal for a trainload of coal with the promise of repayment within two weeks in the amount of $570,000. Aces did not receive payment despite alleged assurances from Peters by text and phone that it was forthcoming. And, in January 2015, Peters convinced Elza to make a loan of $279,000 to fund a bond for Taylor Rose with the promise of repayment within five days in the amount of $300,000. Peters also said Aces would get a promissory note from Tomlin, whom Peters said was his partner. Aces agreed, and the money was wired directly into the Taylor Rose account for immediate payment to CB&T. These debts were not repaid either.

When Peters stopped responding to Elza in January 2015, plaintiffs were allegedly owed a total of $1,424,084.40 for prepaid Cannel Coal, unpaid deliveries to Duke Power, and the two investments solicited by Peters.

### C.    Eagle Coal Sales Deal, Extortion, and Attorney Demands

In the final phase of the alleged racketeering activity, plaintiffs entered into a coal deal to recoup their losses which defendants allegedly used to set plaintiffs up to be extorted. Plaintiffs resisted the demands that followed—first from Tomlin and then from the bank's attorneys before filing this action.

*Eagle Coal Sales Deal*. Unable to reach Peters about the $1.4 million in debts, Elza contacted Trimble. Trimble intervened, found a buyer for some of the remaining Cannel Coal, and brokered a deal with Peters on the understanding that plaintiffs would screen and load the coal until they recouped the money owed "in lieu of the debt being paid." The buyer, Eagle Coal Sales, would then resell the coal to Kolmar Americas and Noble Energy. Trimble received Peters' approval of this arrangement in a text received on January 29, 2015, which plaintiffs alleged falsely

stated that Peters "own[ed] the whole pile." Plaintiffs maintain that they were unaware that CB&T claimed to have a lien on the Cannel Coal at issue.

Between February and mid-April 2015, plaintiffs screened and loaded the Cannel Coal that was being sold to Eagle Coal Sales. Plaintiffs claim that their activities were known to defendants because another operator associated with Tomlin and/or Bransen Energy was also screening and loading coal at the site. Aces incurred additional costs, including unpaid salaries of on-site employees and costs for equipment. When two sets of drivers realized they were not being paid the same rate, Trimble agreed to pay them all but left an angry phone message, which was used to later claim that Elza had threatened violence.

According to plaintiffs, no one objected to their removal of the Cannel Coal because the Peters Defendants, the Tomlin Defendants, and/or the Bank Defendants were setting plaintiffs up in order to claim conversion and extort money to cover the allegedly fraudulent loan. The Bank Defendants were purportedly motivated to join the RICO conspiracy because if Taylor Rose defaulted and the collateral was insufficient, there was a risk that the USDA would void its guarantee and place CB&T's continued operations in jeopardy. On April 16, 2015, Aces moved its last load of Cannel Coal from the site after having "earned back the amounts unpaid by Peters, Bransen Energy, and Taylor Rose, together with repayment of its costs associated with the screening and loading the cannel coal."

*Tomlin's Extortion.* On April 21, five days after plaintiffs moved the last load of Cannel Coal, Tomlin called Elza and demanded payment for 12,000 tons of Cannel Coal that Aces had supposedly purchased from Bransen and removed from the site. Tomlin emailed a purchase order to that effect, which Peters later admitted had been forged. Tomlin tried to get information from

Trimble about the tonnage that had been removed, and then offered to sell Trimble another 5,000 tons of the Cannel Coal without mentioning CB&T's lien. Trimble did not bite.

In early May 2015, Tomlin had an investigator call Elza about the Cannel Coal that had been removed. Then Trimble, Elza, and Elza's son traveled to Atlanta to meet with Tomlin and the investigator. During that meeting, Tomlin admitted to being aware that plaintiffs were removing coal; told them the coal was subject to the bank's lien; and informed them that the USDA was a guarantor of the loan. Tomlin was surprised when Trimble showed him the text from Peters claiming to "own the whole pile."

Over the next few weeks, plaintiffs' attorney was contacted by attorneys for Tomlin, Peters, and Taylor Rose making a demand for $1.4 million, claiming to have a recording of Elza threatening violence, and warning about possible involvement of the USDA and Department of Justice. Plaintiffs' attorney was also contacted by attorneys from the Kilpatrick Firm allegedly "on behalf of all the parties to the loan, including Peters, Tomlin, and CB&T, *among whom, it was represented, the facts had been discussed*." (Emphasis added.) Plaintiffs argued that one could infer from this allegation that the facts known to Tomlin had been shared with CB&T and that CB&T had joined in the conspiracy to extort plaintiffs. Plaintiffs refused the demand for $1.4 million.

*CB&T/Troutman Sanders Demand Letters.* Finally, in August 2015, plaintiffs' attorney was contacted by the Troutman Sanders Defendants on behalf of CB&T and as "attorney-in-fact" for Taylor Rose claiming conversion of the Cannel Coal that was subject to a security interest. Copies of the Demand Letter sent to plaintiffs on August 21, 2015, were sent to others who allegedly knew the "true" facts (including Tomlin's attorney, the Kilpatrick Firm, Stump at CB&T, and Peters at Bransen Energy). The Demand Letter claimed, in part, that plaintiffs stole the coal

from Taylor Rose, sold it to collect a personal debt, and threatened Peters with violence. This time, the demand claimed that the value of the Cannel Coal was $6.375 million and threatened to take civil and criminal action against plaintiffs with the "knowledge, approval, and acquiescence of the Tomlin Defendants." Plaintiffs alleged that similar defamatory letters were also sent to one or both of Eagle Coal's customers. Plaintiffs resisted these demands but filed this action on September 11, 2015.[3]

### D.      Declaratory Judgment

In addition to seeking damages for RICO violations and state-law claims of libel, tortious interference, fraud, unjust enrichment, constructive trust, and civil conspiracy, Aces and Elza brought a claim for declaratory judgment against all of the defendants seeking a declaration that the Eagle Coal transaction was lawful (Count 1). After considering the relevant factors, the court declined to exercise supplemental jurisdiction over the claim in the November 2016 Order. Although that decision is within the scope of this appeal, plaintiffs have forfeited the issue by failing to develop any argument to show an abuse of discretion in that regard. *See Williamson v. Recovery Ltd. P'shp*, 731 F.3d 608, 621 (6th Cir. 2013).

### III.

A dismissal pursuant to Rule 12(b)(6) is reviewed de novo. *Winget v. JP Morgan Chase Bank, N.A.*, 537 F.3d 565, 572 (6th Cir. 2008). In conducting that review, this court "construes the complaint in the light most favorable to the plaintiff, accepts the plaintiff's factual allegations as true, and determines whether the complaint 'contain[s] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *Heinrich v. Waiting Angels Adoption*

---

[3]The Demand Letter and the letter to Kolmar were attached to the First Amended Complaint, but not the Second Amended Complaint.

*Servs., Inc.*, 668 F.3d 393, 403 (6th Cir. 2012) (alteration in original) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). A plaintiff must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

The civil RICO statute, 18 U.S.C. § 1964(c), creates a cause of action for "[a]ny person injured in his business or property by reason of a violation of [18 U.S.C. §] 1962." And "by reason of" means the injury must be proximately caused by the RICO violation. *See Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 265-68 (1992). As noted at the outset, plaintiffs asserted violations of § 1962(c) (conducting an enterprise through a pattern of racketeering activity); § 1962(b) (acquiring or controlling an enterprise through a pattern of racketeering activity); and § 1962(d) (conspiring to violate the other provisions of § 1962). Each is addressed in turn.

A.      Section 1962(c)

To establish a violation of § 1962(c), a plaintiff must plead "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985). The disputed issue in this case is whether a "pattern" was sufficiently pled. A pattern is defined as a minimum of two acts of racketeering activity within ten years of each other, although two acts may not be sufficient. *See* 18 U.S.C. § 1961(5); *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 237 (1989). To establish a pattern, a plaintiff "must show that the racketeering predicates are related, *and* that they amount to or pose a threat of continued criminal activity." *H.J. Inc.*, 492 U.S. at 239. This is known as the "relationship plus continuity" test. *See Heinrich*,

668 F.3d at 409. These components are analyzed separately, although "their proof will often overlap." *H.J. Inc.*, 492 U.S. at 239.[4]

### 1.     Relationship

The relationship prong is satisfied if the predicate acts have "the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *H.J. Inc.*, 492 U.S. at 240 (quoting 18 U.S.C. § 3575(e)). Applying this standard, the district court concluded that the racketeering acts associated with the Dominion "Coke Breeze" scheme were *not* related to the racketeering acts associated with the later schemes, which involved securing the allegedly fraudulent loan from CB&T, the defrauding of plaintiffs to pay on the loan, and the use of the Eagle Coal Sales deal to extort plaintiffs in order to avoid defaulting on the loan. Plaintiffs contend that the district court erred: (1) by relying on this court's analysis of a similar issue in *Vild v. Visconsi*, 956 F.2d 560, 566-67 (6th Cir. 1992); and (2) by rejecting the claim that the Dominion fraud was related because its collapse led to the financial distress that made the later schemes necessary.

First, plaintiffs assert that *Vild* is no longer "good law," arguing that this court adopted a much different test in *Columbia Natural Resources, Inc. v. Tatum*, 58 F.3d 1101 (6th Cir. 1995). But *Columbia* did not cite or overrule *Vild*. Nor was there any real question about the relatedness of the predicate acts in *Columbia*, which involved schemes to defraud Columbia by failing to drill and cap wells, misreporting the amount of resources extracted from wells, and secretly supporting

---

[4]The district court assumed that plaintiffs had alleged an association-in-fact enterprise consisting of the Peters Defendants and the Tomlin Defendants that affected interstate commerce. *See* 18 U.S.C. § 1961(4); *Boyle v. United States*, 556 U.S. 938, 946 (2009). It was also assumed that the racketeering activity consisting of acts of mail fraud, wire fraud, and financial institution fraud were alleged with the specificity required by Fed. R. Civ. P. 9(b). *See* 18 U.S.C. § 1961(1) (racketeering acts); *Heinrich*, 668 F.3d at 404-05. In the absence of any argument on those elements, we do the same.

lawsuits by leasees against Columbia.  *See id*. at 1110-11.  The court in *Columbia* described a "multi-factor"' test for determining whether a pattern exists—*i.e.*, whether the acts are sufficiently continuous *and* related—and did not purport to supplant the relatedness test identified by the Supreme Court in *H.J. Inc*. and applied in *Vild*.  *See id.* at 1110.

Second, the district court did not err by looking to the analysis in *Vild* when assessing the relatedness of the acts here.  Briefly, Vild alleged a scheme to defraud him by inducing him to sign a marketing agreement to sell investments in a resort venture with the intention of forcing him out after the business was established.  The court found that those acts were not related to other predicate acts involving the direct solicitation of real estate investments to customers in violation of various state laws because there were different purposes, results, victims, methods, and only some of the same participants.  *Vild*, 956 F.2d at 566-68.  The decision in *Vild* applied the test from *H.J. Inc.* to the facts presented, which is what is required.  *See also Ouwinga v. Benistar 419 Plan Servs., Inc.*, 694 F.3d 783, 795 (6th Cir. 2012) (finding acts had same purpose of misrepresenting tax consequences of plan, were directed at the plaintiffs, and were made through the same participants); *Heinrich*, 668 F.3d at 409 (finding that predicate acts of misrepresentation to prospective adoptive families were related because they were committed by the same participants, for similar purposes, with similar victims, using similar methods of commission).

Turning to the case at hand, the predicate acts involved in the Dominion fraud were not related to the acts alleged in connection with the later schemes.  The distinct purpose of the alleged Dominion scheme was to cheat on the contract with Dominion by mixing the contracted-for "Run-of-Mine" coal with presumably cheaper "Coke Breeze" that did not meet the contract specifications.  The results were not related as the Dominion fraud resulted in the loss of Dominion's business and termination of the contracts.  The victims were not similar because

Dominion was a coal customer and the other schemes were aimed at plaintiffs and/or CB&T and the USDA. The participants were not the same given that the Dominion fraud was committed by Peters on behalf of Bransen Energy. The method of commission was also not similar to the later frauds given that Dominion was allegedly defrauded by false statements about the quality of the coal being stockpiled for delivery under the contract with Bransen. In contrast, the later schemes involved allegedly false or misleading statements concerning the making of the loan, false promises of forthcoming payment on debts to plaintiffs, fraudulently induced investments from plaintiffs, and attempts to extort plaintiffs with a forged invoice and demands for payment on threats of civil or criminal sanctions. *See Vild*, 956 F.2d at 567 ("A mere allegation that the defendants used wire and mail fraud in two otherwise dissimilar schemes does not, under the circumstances, satisfy the relationship prong of the pattern test.").

Without meaningfully disputing these conclusions, plaintiffs argued instead that the Dominion scheme was related to the later schemes because the "association in fact" enterprise was formed as a result of the financial stress created by the Peters Defendants' loss of Dominion's business. In other words, plaintiffs argue that "the collapse of the Dominion scheme was the but-for and proximate cause of Defendants' later schemes." (Pls' Br., p. 35.) We cannot agree that this satisfies the relationship prong. Plaintiffs' claim that the failure of one fraudulent scheme led to an association that proceeded to commit different frauds on other parties does not demonstrate the relatedness of the respective predicate acts. The district court did not err by disregarding the predicate acts involved in the Dominion fraud in determining whether a RICO pattern had been sufficiently alleged.

### 2. Continuity

The second prong of the pattern test is continuity. "'Continuity' is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." *H.J. Inc.*, 492 U.S. at 241. Whether the predicate acts satisfy the continuity requirement depends on the particular facts of the case. *Id*. at 242; *Moon v. Harrison Piping Supply*, 465 F.3d 719, 724 (6th Cir. 2006). The district court concluded that the predicate acts were not sufficiently continuous to establish either an open-ended or closed-period pattern of racketeering activity. Plaintiffs challenge both determinations.

### a. Open-Ended

When the criminal activity is interrupted by the filing of a RICO action, open-ended continuity may be established where "the related predicates themselves involve a distinct threat of long-term racketeering activity, either implicit[ly] or explicit[ly]." *H.J. Inc.*, 492 U.S. at 242. A threat of continuity may also be established "by showing that the predicate acts or offenses are part of an ongoing entity's regular way of doing business." *Id*. "The threat of continuing racketeering activity need not be established . . . exclusively by reference to the predicate acts alone; rather, a court should consider the totality of the circumstances surrounding the commission of those acts." *Heinrich*, 668 F.3d at 410 (citation omitted). Nor does the fortuitous interruption of that activity affect whether there was a threat of continuing criminal activity at the time the activity occurred. *Id*. (citing *United States v. Busacca*, 936 F.2d 232, 238 (6th Cir. 1991)).

Here, the circumstances surrounding the alleged predicate acts themselves did not present a threat of continuing criminal activity. There was no suggestion that the fraudulent loan could be repeated. Nor did the failure to pay debts owed to plaintiffs pose a continuing threat after communications with Peters ceased in January 2015. Further, using the Eagle Coal Sales deal to

extort plaintiffs to avoid the consequences of the loan with CB&T was "an inherently terminable scheme—a pattern of racketeering activity with a built-in ending point." *Heinrich*, 668 F.3d at 410. Plaintiffs disagree, arguing instead that it was only the filing of this lawsuit that fortuitously interrupted the "shake down" threatening civil or criminal action. (Pls' Br., p. 29.) Even without that interruption, however, the scheme was inherently terminable because the extortionate demands were based on the one-time Eagle Coal Sales arrangement.

In contrast, the adoption fraud scheme in *Heinrich* alleged a threat of continuity because "there [was] no inherent limit to the number of couples seeking to adopt or to the number of children that the defendants could hold out as available for adoption." 668 F.3d at 411. Similarly, in *Busacca*, this court upheld the RICO conviction of a defendant who embezzled pension funds from his union six times before the scheme was interrupted. There, the circumstances established open-ended continuity because the "manner in which the embezzlements occurred was capable of repetition indefinitely into the future." 936 F.2d at 238.

Finally, as the district court explained, this case is distinguishable from *Kalitta Air, LLC v. GSBD & Associates*, 591 F. App'x 338 (6th Cir. 2014). In that case, the dismissal of the RICO claims was reversed because the plaintiff had alleged "sufficient facts to raise a plausible inference of open-ended continuity." *Id*. at 345. Briefly, the plaintiff alleged fraud in connection with a contract for the purchase of jet fuel to be paid from an escrow account only after delivery. The defendant transferred money from the account in violation of the escrow terms and shorted the deliveries of fuel until plaintiff discovered it and terminated the contract. This court concluded that the acts or offenses were part of the defendants' "regular way of doing business." *Id*. That is, at the time the predicate acts occurred, the scheme could have continued indefinitely under the "evergreen" contract that renewed every year unless terminated. *Id*. The scheme, therefore, did

not have a "built-in endpoint" and was not "inherently terminable." *Id*. at 346 (distinguishing cases). Here, unlike in *Kalitta*, plaintiffs failed to allege an open-ended pattern of racketeering activity.

### b.      Closed Period

Alternatively, a plaintiff "alleging a RICO violation may demonstrate continuity over a closed period by proving a series of related predicates extending over a substantial period of time. Predicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement." *H.J. Inc.*, 492 U.S. at 242. The district court identified the earliest alleged acts as having occurred in connection with the loan obtained in July 2014, while the latest possible acts involved the sending of the demand letters in August 2015. The district court concluded that this period, which "endured for thirteen months at most," was too short to satisfy this court's "17-month threshold." Plaintiffs contend that there is no such bright-line rule, and plaintiffs are correct as far as that goes.

This court held in *Vemco* that the predicate acts allegedly committed over a 17-month period failed to establish a closed-ended period of racketeering activity. *See Vemco, Inc. v. Camaradella*, 23 F.3d 129, 134-35 (6th Cir. 1994). However, it would misstate *Vemco* and cases citing *Vemco* to conclude that this court has adopted a bright-line 17-month rule. *See, e.g.*, *Grubbs v. Sheakley Grp., Inc.*, 807 F.3d 785, 805 (6th Cir. 2015) (citing *Vemco*); *Heinrich*, 668 F.3d at 410 (same); *Moon*, 465 F.3d at 725 (same). *Vemco* explained that, after the unrelated predicate acts were disregarded, the remaining acts were insufficient to establish continuity where there was a single fraudulent scheme to misrepresent a guaranteed price and then extort a higher price; the total scheme lasted only seventeen months; and the goal of the single criminal episode was "to get Vemco to pay the cost of *one* paint system." 23 F.3d at 134. *See also Heinrich*, 668 F.3d at 410

(citing *Vemco* as "finding that allegations of four predicate acts, affecting one victim and spanning seventeen months, were insufficient to meet the continuity requirement"). Indeed, even when the predicate acts were committed over an 8-month period, this court did not rely on that fact alone to conclude that a pattern had not been established. *See Grubbs*, 807 F.3d at 805 (holding that a "single eight-month scheme to move the Tri-Serve clients to Sheakley with the single victim of Grubbs cannot meet the standard for closed- or open-ended RICO liability"). Disregarding reliance on a so-called bright-line rule, this court must determine de novo whether plaintiffs sufficiently alleged a closed-period pattern of racketeering activity.

In *H.J. Inc.*, the Supreme Court emphasized that continuity is "centrally a temporal concept" and one that depends on the facts of a given case. 492 U.S. at 242. The Court also rejected a rigid test that would require multiple criminal schemes, while acknowledging that the involvement of multiple criminal schemes would be relevant. *Id*. at 241. Consistent with *H.J. Inc.*, this court applies a multi-factored approach that considers "the number and variety of predicate acts and the length of time over which they were committed, the number of victims, the presence of separate schemes and the occurrence of distinct injuries." *Columbia Nat. Res.*, 58 F.3d at 1110 (quoting *Fleischhauer v. Feltner*, 879 F.2d 1290, 1297 (6th Cir. 1989)). For example, this court has held that the defendants' coordinated scheme to wrongfully terminate the plaintiff's workers' compensation benefits did not establish a closed-ended period of continuity even if the predicate acts had spanned two and one-half years. *See Moon*, 465 F.3d at 725-26. There, the predicate acts were all "keyed" to a "single objective" with no other schemes, purposes, or injuries alleged, or any facts suggesting the scheme would continue once the goal was achieved. *Id*.

In this case, the related predicate acts involved fraudulent schemes aimed at getting the loan, cheating plaintiffs to make payments on the loan, and setting plaintiffs up to be extorted to

pay down the loan. Plaintiffs seem to allege that CB&T may have initially been a victim before joining the extortion effort to hide its own malfeasance or negligence in making the loan. Moreover, apart from obtaining the loan in July 2014, the alleged predicate acts occurred in two phases between November 2014 and August 2015. No facts suggested that the fraud would continue if the defendants' goals were achieved. Although it was error to apply a bright-line rule in making this determination, we agree with the district court that plaintiffs failed to plausibly allege a closed-ended pattern of racketeering activity for purposes of § 1962(c).[5]

### B.    Section 1962(b)

Plaintiffs appeal the dismissal of their separate RICO claim for violation of § 1962(b), which makes it unlawful to "acquire or maintain, directly or indirectly, any interest in or control of any enterprise" through a pattern of racketeering activity. (Count 2). Because the civil RICO statute "authorizes recovery only for injury that a plaintiff suffers 'by reason of' the RICO violation," a claim "for violation of § 1962(b) must allege an 'acquisition or maintenance' injury *separate and apart from the injury suffered as a result of the predicate acts of racketeering activity.*" *Advocacy Org. for Patients & Providers v. Auto Club Ins. Ass'n*, 176 F.3d 315, 329 (6th Cir. 1999) (emphasis added) (citing *Danielsen v. Burnside-Otto Aviation Training Ctr.*, 941 F.2d 1220, 1231 (D.C. Cir. 1991)). The district court concluded that plaintiffs had not alleged an injury from the defendants' acquisition or control of an interest in the RICO enterprise "in addition to

---

[5]In order to state a civil RICO claim, a plaintiff must allege injury to "business or property by reason of" the alleged § 1962 violation. *See* 18 U.S.C. § 1964(c). The "injury to business or property" requirement excludes personal injuries and is sometimes characterized as "statutory standing." *See Jackson v. Sedgwick Claims Mgmt. Servs, Inc.*, 731 F.3d 556, 562 n.2, 563-64 (6th Cir. 2013) (en banc). Because plaintiffs claimed to have been cheated out of and owed a total of $1.4 million as of January 2015, but also alleged to have "recouped" $1.4 million through the Eagle Coal Sales deal, the obvious question is what injury to "business or property" is alleged to have resulted from the predicate acts of racketeering that are the basis of the § 1962(c) claim. We do not reach this issue or decide whether it was fairly raised prior to the November 2016 Order.

injury from the predicate acts."  (Page ID # 1942.) (quoting *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1190 (3d Cir. 1993)).

Plaintiffs insist that the district court "misunderstood" their complaint—specifically, the allegation that "Taylor Rose and/or Bransen Energy . . . were controlled and manipulated by defendants for use by the [enterprise] in defrauding the plaintiffs through a pattern of racketeering activity."  Even in reply, plaintiffs argue that the defendants acquired and maintained control of an enterprise for use as a vehicle for the racketeering activity.  (Reply Br., pp. 18-19.)  These arguments do not identify an alleged injury *separate and apart* from the injury resulting from the predicate acts of racketeering activity.  The district court did not err in concluding that plaintiffs failed to state a RICO claim for violation of § 1962(b).

C.     **Section 1962(d)**

Unlike the substantive RICO counts, plaintiffs' RICO conspiracy claim is asserted against the Bank Defendants and the Troutman Sanders Defendants as well as the Peters and Tomlin Defendants.  To state a claim for violation of § 1962(d), a "plaintiff[] must successfully allege all the elements of a RICO violation, as well as alleging 'the existence of an illicit agreement to violate the substantive RICO provision.'"  *Heinrich*, 668 F.3d at 411 (quoting *United States v. Sinito*, 723 F.2d 1250, 1260 (6th Cir. 1983)).  Because plaintiffs failed to plausibly allege a violation of § 1962(b) or (c), the district court properly dismissed the RICO conspiracy claim as well.  *See Grubbs*, 807 F.3d at 806 ("While the facts, as pled, show ample evidence of agreement . . . , Plaintiffs' RICO conspiracy claim fails because Plaintiffs failed to allege a substantive RICO violation in the first place.").

*         *         *

The dismissal of plaintiffs' civil RICO claims is **AFFIRMED**.